**REED v. COMMISSIONER OF INTERNAL REVENUE (two cases).**

**REED et al. v. COMMISSIONER OF INTERNAL REVENUE.**

**LARUS v. COMMISSIONER OF INTERNAL REVENUE (two cases).**

Nos. 4948, 4952, 4949–4951.

Circuit Court of Appeals, Fourth Circuit.

July 31, 1942.

Robert J. Heberle, of Richmond, Va., for petitioners.

Newton K. Fox, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

These appeals involve deficiencies in income taxes for the year 1936 of a total of $6,483.05. The opinion of the Board of Tax Appeals (hereinafter called the Board), is reported in 45 B.T.A. 1130. Since the petitioners raise no question respecting the findings of fact of the Board, we adopt as fair and accurate the following summary of facts presented in the Board's brief:

All of the petitioners are residents of the State of Virginia. Their income tax returns for the taxable year were filed with the Collector of Internal Revenue at Richmond, Virginia. The petitioners kept no records or books of account other than check books and filed their income tax returns on the cash receipts and disbursements basis.

The Georgia Land & Livestock Company, hereinafter called the Land Company, was organized in 1916. The Land Company owned approximately 128,000 acres of land in Georgia, and issued about $1,400,000 first mortgage bonds which were secured by the 128,000 acres of land. The Land Company also issued slightly less than $200,000 of seven per cent notes. The Land Company bonds and notes were all sold at par. The petitioners purchased bonds and notes of the Land Company for cash at par.

In 1921 the Land Company sold a tract of 35,450 acres of the land securing the Land Company's first mortgage bonds to

James I. Miller. Miller purchased this tract, hereinafter called the property, for a total price of $1,222,000, payable $100,000 in cash and $1,122,000 in six notes of $187,000 each, secured by a first mortgage on the property. Two of the Miller notes were to mature in two years and each of the others was to mature successively in three, four, five, and six years after issue.

In order to release the property from the lien in favor of bondholders of the Land Company it was necessary to retire a certain amount of the outstanding bonds and other indebtedness of the Land Company. A corporation known as "The Investment Company", hereinafter called Investment, which had been organized in Virginia in 1919 for another purpose, was employed to facilitate the sale of the property to Miller. The Land Company transferred the six $187,000 notes of Miller to Investment. Investment then deposited the Miller notes with the American Trust Company as trustee of a collateral trust agreement under which Investment issued to the Land Company collateral trust gold notes to the amount of the Miller notes which were security for this issue. These Investment notes were used in payment of the Land Company's obligation which then encumbered the property. Since the notes of Investment were of even denomination, the exchanges were usually adjusted to the nearest $100, the Land Company paying or receiving the difference in cash.

The obligation of the Land Company to the petitioners and the Investment notes issued in payment were as follows:

After Miller's payments the par value of notes of Investment outstanding in the hands of the petitioners was as follows:

| | |
|---|---|
| Leslie H. Reed | $10,600 |
| Charles C. Reed | 20,100 |
| Lewis G. Larus | 19,200 |
| Charles D. Larus, Jr. | 16,300 |
| John H. Reed | 4,200 |

In 1924 the holders of the collateral trust gold notes of Investment formed a committee, hereinafter called the noteholders' committee, with petitioner Charles C. Reed as chairman. In accordance with the provisions of a deposit agreement dated February 15, 1924, an aggregate of $762,900 of the collateral notes of Investment outstanding was deposited with the First National Bank of Richmond as depositary of the noteholders' committee. The remaining $1,500 in collateral notes outstanding could not be located.

In 1926 the charter of Investment was revoked for nonpayment of franchise taxes. Miller was declared bankrupt in 1932.

By reason of a timber cutting lease, income was being realized from the property up to April, 1935. This money was paid to the American Trust Company, trustee, and was applied on the Miller notes. The funds were in turn paid to the Richmond bank as depository.

After the timber cutting lease expired in April, 1935, the noteholders' committee began to negotiate for a sale or other disposition of the property. The attorney for the noteholders' committee, a real estate agent, Cooper, and a timber cruiser, Bruce, were authorized to represent the

| | Bonds, Notes, Cash Advances | Interest Due | Total Indebtedness | Investment Notes Received |
|---|---|---|---|---|
| Leslie H. Reed | $12,725 | $4,191.52 | $15,916.52 | $15,900 |
| Charles C. Reed | 25,700 | 6,394.79 | 32,094.69 | 32,100 |
| Lewis G. Larus | 32,075 | 7,463.44 | 39,538.44 | 39,600 |
| Charles D. Larus, Jr. | 25,700 | 5,975.43 | 31,675.43 | 31,700 |
| John H. Reed | 6,200 | 1,479.58 | 7,679.58 | 7,700 |

At the time the property was sold to Miller, he was considered a wealthy man and his notes were sold at par. Miller made payments on his notes prior to 1924, thereby reducing his indebtedness to $764,400. The collateral notes of Investment were correspondingly reduced to the sum of $764,400.

committee. Negotiations were had, among others, with the Union Bag & Paper Company, hereinafter called the Bag Company, which on January 6, 1936, offered to lease the property for 99 years based on a valuation of $3 an acre. Early in 1936 Bruce reported that the timber growth had been injured by improper logging methods and

burning, and based on his observation plus sales of similar property in the vicinity, he stated that the property was worth no more than $3 an acre.

On the 12th, 13th and 14th of January, 1936, a meeting of the noteholders of Investment was called at which all of the petitioners were present. After informing the noteholders of the negotiations and of the report of Bruce, petitioner Charles C. Reed requested authority to dispose of the property at $3 an acre. He further informed the noteholders that they could not expect to receive more than that sum per acre.

Under date of January 14, 1936, a letter signed by Mullen in behalf of Charles C. Reed was mailed to all of the noteholders. This letter recited the history of the noteholders' committee, the opinion of the committee concerning the condition of the property, and the offer of the Bag Company to lease the property on the basis of $3 an acre. The letter advocated the acceptance of the offer. On March 3, 1936, the Bag Company forwarded to Mullen a proposed lease at $3 an acre based on 32,082 acres of land. This lease was not accepted by the committee as it claimed there was a larger acreage.

During further negotiations regarding the lease the bank that held the legal title to the property, subject to the Miller mortgage, realizing that its equity therein had no value, advised the noteholders' committee that it desired to divest itself of title to the property.

In April, 1936, Mullen, acting for the noteholders' committee, initiated the incorporation of the Sutherland Bluff Realty Company, hereinafter called Sutherland, for the purpose of having it acquire title to the property. Sutherland's charter was issued on May 21, 1936. Shares of stock of Sutherland were issued in a total amount of $100,000. The bank sold and conveyed the property, subject to the first mortgage, to Sutherland for the sum of $50. Sutherland leased the property to the Bag Company on the basis of $100,000 valuation for the land.

For Sutherland to have clear title to the property it was necessary to remove the first mortgage lien. To effect this result the noteholders' committee exchanged the Investment collateral notes for the Miller notes held by the American Trust Company as trustee. The collateral notes and the collateral agreement were thereupon canceled. The noteholders' committee delivered the six Miller notes, upon which all payments received from the leases had been credited to the depositary for the committee. The committee then informed the depositary that it should deliver the notes as Sutherland might direct. The depositary, at the direction of Sutherland, delivered the notes to the trustee of the Miller first mortgage, which executed a release to Sutherland.

In exchange for removing the first mortgage lien by surrender of the collateral notes, the noteholders' committee received from Sutherland $1,000 in cash and $95,000 in nonassessable stock of Sutherland. One month after this transaction the committee purchased for cash the remaining $5,000 of Sutherland stock, so that it might fully control the corporation. The stock of Sutherland was then distributed proportionately among the noteholders, including the petitioners. At the time of the noteholders' meeting on the 12th, 13th, and 14th of January, 1936, the organization of Sutherland was not contemplated.

All of the petitioners except Leslie H. Reed, claimed deductions for bad debts on their 1936 federal income tax returns in respect of the Investment notes. The amounts so deducted represented a loss equal to the remaining face value of the notes after crediting thereon all cash payments and the par value of the Sutherland stock received. Petitioner Leslie H. Reed computed his loss on his income tax return for the year 1936.

In determining the tax deficiencies the Commissioner disallowed the deductions claimed. The Board of Tax Appeals sustained that action.

Petitioners contend (on these facts) they reasonably determined in 1936 that the collateral notes of Investment held by them were partially worthless, and, accordingly, they properly charged off the amounts of such worthlessness in their federal income tax returns for that year as bad debts. The Board, on the other hand, maintains that the notes were transferred for stock of Sutherland in the course of a tax free exchange under which no loss can be recognized. This is based partly on the theory that Investment ceased to exist in 1926 so that in the taxable year there was no debtor from whom any debt, in whole or in part, could be owing.

The applicable controlling statutory enactment is section 23 of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 1658, 26 U.S. C.A. Int.Rev.Acts, page 828:

"§ 23. Deductions from Gross Income

"In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(e) Losses by Individuals. In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

\* \* \* \* \*

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business;

\* \* \* \* \*

"(k) Bad Debts. Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

■ It is obvious that these separate provisions of the statute regarding losses and bad debts are mutually exclusive. Spring City Foundry Company v. Commissioner, 292 U.S. 182, 189, 54 S.Ct. 644, 78 L.Ed. 1200; Lewellyn v. Elec. Reduction Co., 275 U.S. 243, 246, 48 S.Ct. 63, 72 L.Ed. 262. Therefore, if a loss has been sustained, the taxpayer may not deduct it as a bad debt. Moreover, deductions are not a matter of right but of legislative grace, so that the burden is on the taxpayer to bring his case squarely within the precise terms of the statute. White v. U. S., 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; Woolford Realty Co. v. Rose, 286 U.S. 319, 326, 52 S.Ct. 568, 76 L.Ed. 1128; Georday Enterprises v. Commissioner, 126 F.2d 384; Blenheim Co. v. Commissioner, 4 Cir., 125 F.2d 906; 28 Va.Law Review 657 (1942).

The record in the instant case does not disclose that prior to the acquisition of the Sutherland stock by the petitioners there was any ascertainment of a loss in any specified amount for the purpose of the bad debt deduction. The petitioners kept no books, except check-books, and the only evidence as to the amount of the loss is found in the computation taken as a deduction in the petitioners' income tax returns. But the computation was not made with respect to a debt wholly or partially worthless. Nor was it made on the basis of the value of the stock received in exchange for the cancellation of the debt (after crediting cash payments) and of the release of the mortgage securing the debts.

■ The deductions taken in the returns represented capital losses sustained in the exchange of the notes for the stock of the corporation. Upon the consummation of the exchange there remained no indebtedness to the petitioners either by Miller or the Investment Company. Accordingly, there is no basis for the bad debt charge-off.

■ Moreover, the question of whether an ascertainment of partial worthlessness has been made by a taxpayer who keeps no books is one of fact to be determined by the Board. Under such circumstances an appellate court may not substitute its judgment for that of the Board, Wilmington Trust Company v. Helvering, 62 S.Ct. 984, 86 L.Ed. ——, decided by the Supreme Court on April 27, 1942, Helvering v. Kehoe, 309 U.S. 277, 279, 60 S.Ct. 549, 84 L.Ed. 751, unless the finding below was clearly arbitrary or capricious. Consolidated Dry Goods Co. v. United States, D.C., 35 F.Supp. 523.

■ It is true that any act by a taxpayer manifesting an intent to eliminate an item from his assets is sufficient to constitute a charge-off. Rubinkam v. Commissioner, 7 Cir., 118 F.2d 148. For example, when no books are kept by the taxpayer, a charge-off on a tax return is a satisfactory compliance with the statute. Shiman v. Commissioner, 2 Cir., 60 F.2d 65. Of course, mere good faith is not sufficient and the courts will rescind any arbitrary action by a taxpayer inconsistent with the purpose and spirit of the statute. Herskovits v. Commissioner, 2 Cir., 110 F.2d 272.

■ Furthermore, it should be noted that no deduction for a partial bad debt need be taken even though the taxpayer may have ascertained it to be partially worthless in a specific amount. He has a choice of charging off the amount he has determined to be bad and taking a partial bad debt deduction for that calendar year, or waiting until some future event definitely fixes the exact amount of his loss.

This is entirely at the taxpayer's option. Moock Electric Supply Co. v. Commissioner, 41 B.T.A. 1209.

As was aptly stated by Judge Dickinson in Littlewood v. Kyle, D.C., 34 F.Supp. 509, 510: "The meaning of the phrase 'ascertained and charged off' has frequently engaged the attention of the Courts. If the taxpayer was in business, keeping what is called a regular set of books, the phrase 'charged off' has a definite meaning. If, however, he kept no books, the phrase becomes well nigh meaningless."

█ It is, therefore, not necessary for us to discuss the many cases cited by petitioners other than to note that they relate merely to the method of ascertaining whether debts were charged off in the taxable year, with no question of an exchange of property for property. It seems clear to us that section 23(k) of the Revenue Act of 1936 is concerned with a debt which is continued to be held by the taxpayer and the allowance is in anticipation of a loss which will be occasioned when an accounting is made with the defaulting debtor. In the instant case, it is evident that there never will be an accounting. The petitioners effectively disposed of their Investment notes and thereby avoided such an accounting. Accordingly, their tax position now is whether, under these circumstances, the Revenue Act recognizes the deductibility of any loss in 1936.

A review of the basic facts reveals that the Investment notes were handed over and cancelled in exchange for the Miller notes, the latter in turn being delivered to the depositary for the noteholders' committee. The depositary was then directed to deliver the Miller notes in accordance with Sutherland's instructions. Pursuant to this plan, Sutherland directed a delivery to the trustee of the Miller mortgage. Sutherland then received a release of the mortgage from the trustee and thereby became the owner of the property free from any lien. Thus, the noteholders acquired control of Sutherland in lieu of the equitable interest in the Investment notes formerly held by them. The authorized issued capital stock of Sutherland was $100,000, 95% of which was acquired by the noteholders (including petitioners) in proportion to their respective interests in the property exchanged for the stock. This was sufficient to bring into play section 112(h) of the Revenue Act of 1936 26 U.S.C.A. Int.Rev.Acts page 859 regarding recognition of gain or loss: "(h) Definition of control. As used in this section the term 'control' means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

█ It is quite obvious that this circuitous and expedient arrangement concocted by petitioners produced the same result that would have been achieved had the Investment notes been transferred to Sutherland in the first instance. In the light of the realities of the situation it is, therefore, difficult to perceive any valid reason why the transaction should not be viewed as a whole, and thereby treated as having constituted an exchange, even though neither the Investment notes nor the Miller notes were directly transferred for the stock of Sutherland. Cf. Starr v. Commissioner, 4 Cir., 82 F.2d 964, 965, 968; Rockford Brick & Tile Co. v. Commissioner, 31 B.T.A. 537.

Accordingly, we feel that the above transfer of the Investment notes (or petitioners' equitable interest therein) for the Sutherland stock constituted an exchange within the intendment of section 112(b) (5) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 855, whereby no loss or gain can be recognized: "(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange."

Cf. Helvering v. Cement Investors, 62 S.Ct. 1125, 86 L.Ed. ——.

In reaching this conclusion we are not unmindful of the authorities cited by petitioners including Commissioner v. Spreckels, 9 Cir., 120 F.2d 517; Commissioner v. National Bank of Commerce of San Antonio, Texas, 5 Cir., 112 F.2d 946; Bingham v. Commissioner, 2 Cir., 105 F.2d 971. Cf. Pender v. Commissioner, 4 Cir., 110 F.2d 477. These decisions, however, con-

cerned transactions between mortgagor and mortgagee when realty was deeded back to the vendor in consideration of the cancellation of the mortgage and the notes secured thereby. They clearly did not involve the exchange of "property" for stock of a corporation as is true in the instant case.

Nor does our decision impose an undue hardship on the petitioners inasmuch as the deductibility of the loss, if any, is merely postponed until the petitioners dispose of the stock received in the exchange. That is the proper time to claim a deduction for such loss as has been sustained.

The decisions of the Board of Tax Appeals are affirmed.

Affirmed.