E. S. Dillard and Jean T. Dillard, Husband and Wife v. Commissioner.
Dillard v. Commissioner
Docket No. 78915.
United States Tax Court
T.C. Memo 1961-30; 1961 Tax Ct. Memo LEXIS 326; 20 T.C.M. (CCH) 137; T.C.M. (RIA) 61030; January 31, 1961
William Thomas Minor, Jr., Esq., Johnston Building, Charlotte, N.C., for the petitioners. Richard C. Forman, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in the income taxes of the petitioners as follows: Year
Deficiency
1954
$86,319.93
1955
6,168.83
The issues to be decided are: (1) Whether the petitioners realized a gain of $83,171.76 when E. S. Dillard exchanged accounts payable *327 and notes payable of Brown Dynalube Company, Inc., in addition to cash, for the 20-year, 6 per cent subordinated debentures of the same company, having a face value of $85,000; and (2) What was the fair market value of the Brown Dynalube Company, Inc., bonds which E. S. Dillard donated to charity on December 9, 1954, and September 20, 1955. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. The petitioners, E. S. Dillard (hereinafter referred to as Dillard) and Jean T. Dillard, are husband and wife residing in Lynchburg, Virginia. During the taxable years 1954 and 1955, the Dillards resided in Charlotte, North Carolina and filed joint income tax returns with the district director of internal revenue, Greensboro, North Carolina, for those years. Dillard is an executive associated principally with corporations engaged in the manufacture of paper boxes and cartons. During the years 1954 and 1955, and continuously since that time, he has been president of the Old Dominion Box Company, Inc., a Virginia corporation with its principal office in Lynchburg, Virginia; the Valley Board Corporation, a West Virginia corporation engaged in the manufacture *328 of paperboard products; Dacam Corporation, a North Carolina corporation engaged in the manufacture of equipment for packaging cartons and paper boxes, and Palmetto Box Company, a South Carolina corporation of Greenville, South Carolina, engaged in the manufacture of paper box products. Brown Dynalube Company, Inc., (hereinafter called Dynalube) was organized under the laws of the State of North Carolina on May 11, 1950, as Brown Distributing Company, Inc. Its certificate of incorporation was amended to change its name to Brown Dynalube Company, Inc., in July 1950. From the time of its organization until September 15, 1959, the outstanding capital stock of Dynalube consisted of four shares of $100 par value common stock. The two original stockholders of Dynalube were E. H. Newcombe (hereinafter called Newcombe) and D. M. Coddington (hereinafter called Coddington), both of Charlotte, North Carolina. Newcombe and Coddington each owned two shares of Dynalube's common stock. Newcombe was elected the first president of Dynalube, and he has served continuously in such capacity, although he has drawn no compensation or commissions of any type from Dynalube since 1951. Dynalube was originally *329 the exclusive sales agent for grease guns or lubricating devices manufactured by William Young Brown, who held and still holds patents for these devices. William Young Brown later became an employee of Brown Dynalube Manufacturing Company (hereinafter called the partnership), a partnership in which Newcombe and Coddington were equal partners. The partnership then replaced William Young Brown as manufacturer of the grease guns and lubricating devices, and Dynalube (the corporation) continued as the exclusive sales agent for the new manufacturer. The business of Dynalube proved unprofitable and for the years 1950 to 1953, inclusive, reported net operating losses as follows: Year
Amount of Loss
1950
$40,607.55
1951
30,945.77
1952
5,994.72
1953
550.54
Total
$78,098.58
As of September 30, 1953, Dynalube was indebted to the partnership to the extent of $77,477.46. For its fiscal year ended September 30, 1953, the partnership wrote this amount off as a bad debt on its books and income tax return. The deduction was allowed in full by the Internal Revenue Service when claimed by the partnership and the individual partners on their respective returns. C. C. Coddington, *330 Inc., was a corporation owned equally by Coddington and his brother. As of December 31, 1953, Dynalube was indebted to C. C. Coddington, Inc., because of loans in the amount of $4,455.64. In the dissolution of C. C. Coddington, Inc., on December 1, 1954, this indebtedness was charged off on the corporate books as a bad debt. As of December 31, 1953, Dynalube was indebted to four other creditors as follows: Name of Creditor
Amount Owed
Charlotte Metal Processing
Company
$ 54.73
Mayer, Barber and Spigener
517.10
Washburn Printing Company
450.00
McDonald Insurance Agency
216.83
Total
$1,238.66
On February 26, 1954, the partnership, Brown Dynalube Manufacturing Company, was dissolved. In connection with the dissolution, Newcombe and Coddington, for moral reasons, assumed personal liability for the debts Dynalube owed to the four creditors referred to in the preceding paragraph. On May 7, 1954, Newcombe and Coddington, as partners, paid those particular debts through their attorney. On December 31, 1953, Newcombe, acting individually and as a partner in the partnership, assigned to Eleanor Meares all of his claims against Dynalube in return for one dollar. *331 On the same day he endorsed his certificate for two shares of Dynalube stock over to Eleanor Meares. On May 7, 1954, Coddington, acting individually and as president of C. C. Coddington, Inc., assigned to Eleanor Meares all of his and the corporation's claims against Dynalube in return for one dollar. On this same date, Coddington endorsed his certificate for two shares of Dynalube stock over to Eleanor Meares. On May 15, 1954, Eleanor Meares entered into a contract with Dillard which recited that in return for one dollar she was assigning and transferring to Dillard all claims she held against Dynalube totaling $83,171.76, plus the four shares of Dynalube's outstanding stock. The following constituted the liabilities transferred from Eleanor Meares to E. S. Dillard: (a) Notes and accrued interest due
C. C. Coddington, Inc.
$ 3,935.00
(b) Accounts due to the following per-
sons by Brown Dynalube Co.,
Inc.
C. C. Coddington, Inc.
$ 520.64
Charlotte Processing Company
54.73
Mayer, Barber & Spigener
517.10
Washburn Printing Company
450.00
McDonald Insurance Agency
216.83
Total
$ 1,759.30
Accounts payable due to the
Brown Dynalube Manufacturing
Co., a partnership
$77,477.46
Total
$83,171.76
*332 On May 15, 1954, Dillard entered into a contract with Dynalube, which recited that in return for the issuance to him of 6 per cent subordinated debentures, (hereinafter called Dynalube bonds) with a face value of $85,000, Dillard was assigning and transferring to Dynalube all claims he held against Dynalube totaling $83,171.76, plus the sum of $1,828.24. On the same date, Dynalube issued to Dillard a stock certificate representing the four outstanding shares of Dynalube's stock. On or about May 20, 1954, Dynalube issued to Dillard a series of 6 per cent debenture bonds in the face amount of $85,000, with a maturity date of May 15, 1974. The following balance sheet shows the financial condition of Dynalube on May 20, 1954, after the issuance of the bonds but before acquisition of certain packaging machines from Dacam Corporation: BALANCE SHEET #1 - May 20, 1954
ASSETS
Cash in bank
$ 1,828.24
Office furniture and fixtures
$ 2,070.03
Reserve for depreciation
512.84
1,557.19
Accounts receivable - other
207.16
Goodwill
3,355.01
TOTAL ASSETS
$ 6,947.60
LIABILITIES
6% subordinated debentures due May 15, 1974
$85,000.00
NET WORTH
Capital stock issued
$ 400.00
Surplus (deficit)
(78,452.40)
(78,052.40)
TOTAL LIABILITIES AND NET WORTH
$ 6,947.60
*333 Dacam Corporation was incorporated on September 26, 1947, under the laws of the State of North Carolina. The principal business of this company is manufacturing equipment for packaging cartons and paper boxes. During the years 1954 to 1956, Dillard owned more than 50 per cent of the stock of Dacam. In addition, members of Dillard's family owned an interest in the company. In May of 1954, Dillard borrowed $90,000 from the American Trust Company and loaned the funds to Dynalube. As security for this loan, Dillard received from Dynalube a note and chattel mortgage on 32 Dacam 200 D packaging machines. The note and chattel mortgage were then pledged by Dillard as security with the bank for its loan to him. In May of 1954, Dynalube used the funds which it borrowed from Dillard to purchase, from the Dacam Corporation, 32 Dacam 200 D packaging machines, the same machines on which Dynalube gave a chattel mortgage to Dillard. The purchase price was $84,499.26, which was Dacam's depreciated cost or book value of the machines. The remainder of the funds borrowed from Dillard were used by Dynalube as operating capital in its business. Later in 1954, Dynalube purchased from Dacam Corporation *334 eight additional 200 D packaging machines for book value. In order to facilitate this purchase, Dynalube borrowed $18,000 directly from the American Trust Company on a note endorsed by Dillard and secured by a chattel mortgage on the aforementioned packaging machines. The following balance sheet shows the financial condition of Dynalube on May 20 1954, immediately after the aforesaid loan and the purchase of 32 Dacam 200 D packaging machines: BALANCE SHEET #2 - May 20, 1954
ASSETS
Cash in bank (deposits in transit)
$ 7,328.98
Packaging machines (security for note to E. S. Dillard)
84,499.26
Office furniture and fixtures
$ 2,070.03
Less reserve for depreciation
512.84
1,557.19
Accounts receivable
207.16
Goodwill
3,355.01
TOTAL ASSETS
$ 96,947.60
LIABILITIES
Notes payable - E. S. Dillard 3% due in installments of $3,000
beginning July 1, 1954, plus interest secured by Chattel
Mortgage on 32 packaging machines
90,000.00
6% subordinated debentures due May 15, 1974
85,000.00
TOTAL LIABILITIES
$175,000.00
NET WORTH
Capital stock issued
$ 400.00
Surplus (Deficit)
(78,452.40)
(78,052.40)
TOTAL LIABILITIES AND NET WORTH
$ 96,947.60
*335 For the calendar year 1954, Dynalube earned $26,574.88. For the calendar year 1955, Dynalube earned $10,244.62. Prior to December 9, 1954, Newcombe approached Dillard and asked for a chance to acquire stock or some other invested interest in Dynalube. The principal reason why Newcombe wanted to purchase an interest in Dynalube was to strengthen his position with and show good faith in his dealings with Dillard. Dillard declined to sell Newcombe any stock or bonds prior to December 9, 1954. However, after his conversation with Newcombe, Dillard spoke to his attorney and accountant, William Thomas Minor, Jr. (hereinafter referred to as Minor), who advised Dillard that he would work out some method to get some Dynalube bonds into Newcombe's hands. On December 8, 1954, Dillard purchased from Dynalube, for $2,500 cash, an additional 6 per cent subordinated debenture in the face amount of $2,500. Dillard's motive for making this additional purchase was to satisfy Dynalube's need for operating capital. On December 9, 1954, Dillard donated a Dynalube bond having a face value of $10,000, to the Trinity Presbyterian Church of Charlotte, North Carolina. On their 1954 Federal income tax *336 return, the Dillards deducted $10,000 as a charitable contribution because of this donation. This bond had a fair market value of $3,750 on the day it was donated to the church. On or about December 9, 1954, the Trinity Presbyterian Church sold this same bond to E. H. Newcombe for $10,000 cash. In August 1958, Newcombe sold Dynalube bonds having a face value of $5,000 to Massie Construction Corporation, a company owned and/or controlled by Minor and/or his family, for $5,000 cash. In February 1959, Newcombe sold his remaining Dynalube bond, having a face value of $5,000, to the children of E. S. Dillard for $5,000 cash. On or about December 9, 1954, Dillard donated a Dynalube bond, having a face value of $20,000, to the Dillard Foundation, Inc. On their 1954 Federal income tax return, the Dillards deducted $20,000 as a charitable contribution because of this donation. This bond had a fair market value of $7,500 on the day it was donated to the Dillard Foundation, Inc. The Dillard Foundation, Inc., sold this same bond to the Massie Construction Corporation on September 15, 1959, for $20,000 cash and accrued interest. On or about September 20, 1955, Dillard donated a Dynalube bond, *337 having a face value of $10,000, to the Trinity Presbyterian Church. On their 1955 Federal income tax return the Dillards deducted $10,000 as a charitable contribution because of this donation. This bond had a fair market value of $6,000 on the day it was donated to the Trinity Presbyterian Church. The Minor Foundation, Inc., on or about September 30, 1955, purchased part of the aforementioned bond, having a face value of $4,500, for $4,500 cash. The Massie Construction Corporation, on or about September 15, 1959, purchased the remaining part of the donated bond having a face value of $5,500 for $5,500 cash. The Trinity Presbyterian Church and the Dillard Foundation, Inc., are charitable institutions and exempt from Federal income taxation. Opinion Issue 1 The petitioners contend that they did not realize a gain of $83,171.76 when E. S. Dillard exchanged accounts and notes payable of Dynalube in addition to cash, for the 20-year, 6 per cent subordinated debentures of the same company. To support their contention, petitioners rely on section 112(b)(5) of the Internal Revenue Code of 1939. [1]
We agree *338 with the petitioners. Section 112(b)(5) provides non-recognition of gain or loss if these three tests are met: (1) there must be a transfer of property to a corporation by the transferor, (2) the transfer must be solely in exchange for stock or securities in such corporation, and (3) immediately after the exchange such person or persons (transferors) must be in control of the corporation. We are satisfied that petitioners have met these tests. First, the indebtedness and cash transferred to Dynalube by Dillard was property within the meaning of section 112(b)(5). In Alexander E. Duncan, 9 T.C. 468 (1947), the petitioner had exchanged judgment claims which it held against a corporation for stock in the corporation. Against the Commissioner's contention that the indebtedness was not property, we held: Section 112(b)(5) applies where holders of obligations (including notes) of a corporation surrender those obligations in exchange for stock of a new corporation organized to take over and continue the business of the original obligor. Miller & Paine, * * * [42 B.T.A. 586 (1940)]; Reed v. Commissioner, * * * [129 F. 2d 908 (C.A. 4, 1942), *339 affirming 45 B.T.A. 1130 (1941)]; Rockford Brick & Tile Co., 31 B.T.A. 537; Hartford-Empire Co. v. Commissioner, 137 Fed. (2d) 540, affirming 43 B.T.A. 113. Cf. George P. Skouras, 45 B.T.A. 1024; Helvering v. Cement Investors, Inc., 316 U.S. 527. It was held in some, or all, of those cases that the surrender of the obligations for cancellation was a transfer in exchange within section 112(b)(5). Furthermore, it is well settled that money is "property" within the meaning of that term as used in section 112(b)(5). George P. Skouras, 45 B.T.A. 1024 (1941); Halliburton v. Commissioner, 78 F. 2d 265 (C.A. 9, 1935); Claude Neon Lights, Inc., 35 B.T.A. 424 (1937); Portland Oil Co. v. Commissioner, 109 F. 2d 479 (C.A. 1, 1940); G.C.M. 24415, 1944-1, C.B. 219. Second, the transfer was solely in exchange for stock or securities in the corporation. In Camp Wolters Enterprises, Inc., 22 T.C. 737 (1954), affd. 230 F. 2d 555 (C.A. 5, 1956), certiorari denied per curiam 352 U.S. 826 (1956), we held that the *340 phrase "stock or securities" has the same meaning when used in section 112(b)(5) as when used in sections 112(b)(3) and (4). In Helvering v. Watts, 296 U.S. 387 (1935); Daniel H. Burnham, 33 B.T.A. 147 (1935), affd. 86 F. 2d 776 (C.A. 7, 1935); Alan O. Hickok, 32 T.C. 80 (1959), it was held that bonds are "securities." Third, the transferor was in control of the corporation immediately after the exchange. For the purpose of 112(b)(5), "control" means the ownership of at least 80 per cent of the then issued voting stock and at least 80 per cent of the total number of shares of all other classes of then issued stock of such corporation. Since Dillard owned all the stock of Dynalube both before and after the exchange, the control test of the statute is satisfied. Since the three tests of section 112(b)(5) have been met, no gain or loss is to be recognized with respect to the exchange in question. Issue 2 Section 170(a)(1) of the Internal Revenue Code of 1954 provides, in part, that there shall be allowed as a deduction any charitable contribution, payment of which is made within the taxable year. If a *341 contribution is made in property other than money, the amount of the deduction is determined by the fair market value of the property at the time of the contribution. Cf. Income Tax Regulations, section 1.170-1(c). In the instant case, the petitioners contend that the fair market value of the donated bonds was their face value. Petitioners point to the fact that on December 9, 1954, the same day Dillard contributed a bond to the Trinity Presbyterian Church, having a face value of $10,000, the church sold the same bond to E. H. Newcombe, who was not related to Dillard by blood or marriage, for $10,000 cash. Petitioners also point out that on December 8, 1954, Dillard, himself, purchased a bond, having a face value of $2,500, for $2,500 cash. Furthermore, petitioners contend that the bond, having a face value of $20,000, contributed to the Dillard Foundation, Inc., on December 9, 1954, was purchased on September 15, 1959, by the Massie Construction Corporation, a company which neither Dillard nor his family had any interest in, for $20,000 cash. In addition, a portion ($4,500) of the bond having a face value of $10,000, which was contributed to the Trinity *342 Presbyterian Church on September 20, 1955, was sold to the Minor Foundation, Inc., a company which neither Dillard nor his family had any interest in, on September 30, 1955, for $4,500 cash. The remaining portion of the bond, having a face value of $5,500, was sold to the Massie Construction on September 15, 1959, for $5,500 cash. The fair market price at a particular time is a question of fact to be determined from all the circumstances. Market price implies the existence of a market, of supply and demand, of seller and buyers. Sales are always evidence of a market price, but Income Tax Regulations, section 1.170-1(c), require not only a market value but a "fair market value." Sales made at a particular time and place may be significant, but the price paid is not necessarily decisive of fair market price or value. The fact of sales, in itself and without regard to the circumstances under which the sales were made, does not conclusively establish either fair market price or value. Sales made under peculiar and unusual circumstances, such as sales of small lots, forced sales, and sales in a restricted market may signify neither a fair market price nor value. *343 Heiner v. Crosby, 24 F. 2d 191 (C.A. 3, 1928). In order to determine whether or not the sales of the bonds to the respective parties in this case establish their fair market value, we must look to all circumstances surrounding their sales. The bonds in question were unsecured 20-year, 6 per cent, subordinated debentures, due May 15, 1974. The subordination clause reads as follows: The indebtedness evidenced by this debenture shall be "Subordinate" or "Junior" in right to any and all indebtedness of the Corporation incurred in the usual course of business evidenced by secured and/or unsecured notes sold to first mortgage bond holders and/or national and/or state banking institutions, regardless of when the first mortgage bonds or loans from national and/or state banking institutions are contracted. Thus, the bonds are subordinate in right to any and all indebtedness of the corporation regardless of when contracted, a factor having an obvious relation to their fair market value. It is true that at the time the bonds were donated to charity, their maturity date was still some nineteen years away and the corporation's need for assets was not immediate. On the other *344 hand, we must remember that, since its inception in 1950, the company had sustained losses each year through 1953 in the aggregate amount of $78,098.58. The year 1954 was the first profitable one in the history of the company, and, with respect to the profitable operation in that year, Dillard himself admitted that there was no guarantee that the income from the machine leases would continue. His testimony on this point was as follows: The leases were based on the number of folding box cartons. The lease could either be worth as income six or eight thousand dollars per unit or it could be worth nothing. Here you were sitting there with capital investment. If the customer decided to go in another type of operation, a different mechanical machine, and the machine was kicked out, and on three different occasions that happened; there was no way in the world to guarantee that this thing would be a so-called bonanza or stipulated positive income to Brown Dynalube. On December 8, 1954, Dillard purchased an additional bond from Dynalube, his wholly-owned corporation, having a face value of $2,500, for $2,500 cash. Fair market value is the price at which property would change hands between *345 a willing buyer and a willing seller, neither being under any compulsion to buy or sell. Fair market value contemplates two parties, both driving the hardest bargain he can to obtain the best possible price for himself. Both the petitioner and the respondent agreed that the reason Dillard purchased this additional bond was to supply working capital for the company. Under these circumstances, we cannot accept this particular sale as establishing fair market value. With respect to the sale to Newcombe for $10,000 cash of the $10,000 bond, which Dillard had donated to the Trinity Presbyterian Church on December 9, 1954, Newcombe's testimony is enlightening. Q. Mr. Newcombe, did you on or about December 9, 1954, purchase from the Trinity Presbyterian Church a ten thousand dollar face value Brown Dynalube Corporation six percent debenture bond? A. Yes. Q. How much did you pay for it? A. Ten thousand dollars. Q. Was the ten thousand dollars your ten thousand dollars? A. Yes, sir. Q. Why did you buy this bond, if you will tell the Court very briefly. A. I bought it for several reasons. Number one I thought it was a good investment. I had this money lying idle in the bank. *346 A six percent investment looked good and I was not afraid of it, dealing with Mr. Dillard. I figured he would take care of me to see that I never lost any money. And number two, I wanted to strengthen my position with Mr. Dillard to show him that I was sincere in my belief that this company could go. On cross examination, Newcombe testified as follows: Q. Now in December of 1954, you stated you would rather have debentures than stock. Do you know the difference between debentures and stock? A. Well, yes. I think if the company didn't go over, if they had difficulties, that the debentures would be taken care of first before the common stock. Q. You became a creditor of the corporation rather than an owner? A. Yes. Q. That was satisfactory to you? A. You mean with the debentures? Q. Yes. You had no voting rights and no interest in profit? A. Yes, under the conditions that would suit me all right. Q. Because you felt that you had an agreement with Mr. Dillard, what you held and which were called debentures, were, in realty, your way of showing good faith and your ownership in the corporation? A. Yes. * * *
Q. Did you [have] any idea in December 1954 that *347 you might some day sell these bonds to Mr. Dillard's children? A. No. Q. Wasn't it back in your mind that Mr. Dillard would make these bonds good? A. Yes. * * *
Q. If you had had the funds wouldn't you want to invest in this company? A. I did when I had the funds. Q. You invested in December. Had you approached Mr. Dillard before that time with respect to investing? A. I am not sure when I discussed it. Q. Could it have been from time to time beginning in May? A. No. I did it all once in a hurry. I have forgotten when. I wanted to show good faith on my side with Mr. Dillard. Q. Before you purchased these bonds for ten thousand dollars did you have an individual audit made of the Brown Dynalube Company? A. No. Q. Did you know if you were making a good investment? A. I was making an investment with Mr. Dillard. I was looking to him. Q. Who suggested that you purchase them from the church? A. I think it was Mr. Minor. It is apparent from the foregoing that Newcombe was not primarily concerned with the value of the bonds, but was more concerned with impressing Dillard with his own good faith in the company's future. Moreover, Newcombe was investing *348 in Dillard rather than in the company. A sale wherein peculiar circumstances tend to inflate the price at which property is sold is not a proper measure of fair market value. Estate of A. Plumer Austin, 10 B.T.A. 1055 (1928). We have found as a fact that the bond had a fair market value of $3,750 on the day it was donated to the church. On September 20, 1955, Dillard donated a Dynalube bond having a face value of $10,000 to the Trinity Presbyterian Church, a portion of this bond having a face value of $4,500, was sold to the Minor Foundation, Inc., for $4,500 cash on September 30, 1955. The evidence does not show that this was other than an arm's-length transaction. However, we refuse to accept this single, isolated transaction as establishing a fair market value which the overall circumstances show to be at variance with the facts. We have found as a fact that the $10,000 face value bond donated to the Trinity Presbyterian Church on September 20, 1955, had a fair market value on that date of $6,000. Sometime in August of 1959, Dynalube sold all its packaging machines to the Old Dominion Box Company, a company which Dillard and his father owned. On or about September 15, 1959, Massie *349 Construction Corporation, a company owned, and/or controlled by Minor and/or his family, purchased from the Dillard Foundation, Inc., for $20,000 cash, a Dynalube bond having a face value of $20,000. On or about the same date, Massie purchased from the Trinity Presbyterian Church, for $5,500 cash, a Dynalube bond having a face value of $5,500. To assist in evaluating these transactions, the following schedule shows the profit and loss sustained by Brown for the years 1954 to September 30, 1959: Amount of
Year
Profit (Loss)
1954
$26,574.88
1955
10,244.62
1956
(3,846.55)
1957
(12,910.61)
1958
(11,034.44)
1959 (9 months)
(13,034.13) Moreover, the following table compares the balance sheet of Dynalube as of December 31, 1958, with the one as of September 30, 1959, which is as follows: 12-31-1958
9-30-1959
ASSETS
Current Assets
Cash
$ 170.66
$4,668.62
Accounts Receivable
161.45
0
Grease gun equipment - inventory
1,470.34
1,470.34
TOTAL CURRENT ASSETS
$ 1,802.45
$6,138.96
Packaging machines
$104,235.09
Less Reserve for Depreciation
47,613.96
56,621.13
0
Deposit - franchise tax
90.00
66.55
Goodwill
3,355.01
3,355.01
TOTAL ASSETS
$ 61,868.59
$9,560.52
LIABILITIES
Current Liabilities
Accounts payable - Dacam Corp.
0
$4,119.15
Notes payable - American Commercial
Bank
$ 16,666.84
0
Accrued interest
656.25
0
Due E. S. Dillard
26,070.00
0
TOTAL CURRENT LIABILITIES
$ 43,393.09
$4,119.15
Long-Term Debt
6% subordinated debenture bonds
87,500.00
0
TOTAL LIABILITIES
$130,893.09
$4,119.15
NET WORTH
Common stock outstanding
$ 400.00
$87,500.00
Deficit
(69,424.50)
(82,458.63)
(69,024.50)
5,441.37
TOTAL LIABILITIES AND NET WORTH
$ 61,868.59
$9,560.52
*350 The sale of these bonds approximately three to four years after they were donated to the charities does not establish their fair market value on the date they were donated. Indeed, with respect to the sale itself, we cannot overlook several factors that lead us to discount its probative value. The sale was made to a corporation controlled by the taxpayer's attorney. The company had lost money for almost four consecutive years. Furthermore, in comparing the balance sheet as of December 31, 1958, with that of September 30, 1959, we see that the corporation was practically a shell by the latter date. Just fifteen days after Massie purchased the bonds, the corporation had slightly over $2,000 in tangible assets after allowing enough to pay the liabilities. Taking all these factors into consideration, we do not believe that the sales of the bonds to Massie Construction Corporation established the fair market value of the Dynalube bonds. The respondent argues that none of the bonds in question had any fair market value. However, the fair market value of property is a question of fact, and only in rare and extraordinary cases will property be considered to have no fair market value. Cf. *351 Income Tax Regulations, section 1.1001-1; Boudreau v. Commissioner, 134 F. 2d 360 (C.A. 5, 1943). We have found as a fact that the bonds had a fair market value on the dates they were donated to the charities, as summarized by the following recapitulation: Date of
Fair
Charity
Donation
Face Value
Market Value
Trinity Presbyterian Church
12- 9-54
$10,000
$3,750
Dillard Foundation, Inc.
12- 9-54
20,000
7,500
Trinity Presbyterian Church
9-20-55
10,000
6,000
Decision will be entered under Rule 50. Footnotes
1. All references to section 112(b)(5)↩ herein refer to the 1939 Code.