Sherman B. HARLAN, Receiver for General Credit Corporation

v.

The UNITED STATES.

No. 546–57.

United States Court of Claims.

Jan. 11, 1963.

H. Cecil Kilpatrick, Washington, D. C., and Charles H. Dickmann, Anderson, Ind., for plaintiff. Evan Howell, Washington, D.C., was on the briefs.

S. Laurence Shaiman, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

DAVIS, Judge.

This is an unusual income tax refund suit in which the taxpayer's receiver claims that, under its former management, the corporation deliberately overstated its income, and overpaid its taxes, for 1949 and 1950. We find the charge

true, but not to the extent claimed by the plaintiff.[1]

The taxpayer, General Credit Corporation, is an Indiana corporation engaged during the taxable years in the discount and small loan business in the northern part of the state. It was under the control of the Anderson family which largely staffed its main office and held the more important positions. At that time taxpayer had outstanding 14,717 shares of regular common stock, the only voting stock so long as dividends were paid regularly on the Class A non-voting common stock; there were 100,000 outstanding shares of this Class A common,[2] which was wholly non-voting unless and until four semiannual dividends were passed. The Andersons held ownership control of the voting stock but had no substantial interest in the Class A shares, which were widely distributed throughout Indiana. The plaintiff asserts that the Andersons, then in control of the company, improperly reported non-existent income for 1949 and 1950 so that they could, concomitantly, continue paying dividends on the Class A common and thus ensure their remaining in control.

The alleged overpayments of federal income taxes came to light after the company's board of directors appointed a management committee in July 1952. On this committee's recommendation, the Andersons resigned their offices and new management was installed to attempt to salvage the corporation. This effort was unsuccessful and plaintiff was subsequently appointed receiver by an Indiana state court. Meanwhile, the new management hired new accountants to review the company's financial condition. This suit was brought as a result of those accountants' studies.

The several different types of alleged overstatements of income require separate treatment. They are not all governed by the same principles or the same facts.

1. For both 1949 and 1950, plaintiff claims that the "Accounts Financed" shown on the taxpayer's books were fictitious and/or worthless accounts, and therefore that the interest accrued on those accounts, on the company's books, was fictitious or nonexistent income. These "Accounts Financed" items represented debts owed to General Credit on various loans made by it to merchants who sold goods on credit. Since the taxpayer was on the accrual basis, it recorded, at the end of the fiscal year, the accrued interest rightfully earned on those loans, whether or not any such interest was actually paid or received during the year. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184–185, 54 S. Ct. 644, 78 L.Ed. 1200 (1934); Estate of Putnam v. Commissioner, 324 U.S. 393, 399, 65 S.Ct. 811, 89 L.Ed. 1023 (1945); Commissioner v. Hansen, 360 U.S. 446, 464, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959). The plaintiff challenges this accrual of interest, to some extent on the ground of insufficient proof that such loans were ever really made by the taxpayer (i. e., that the loans were entirely "fictitious"), but primarily on the ground that in the taxable years the loans, even if initially valid, were so delinquent that they had become wholly "worthless" and therefore no longer validly capable of earning interest. Insofar as plaintiff charges that these accounts were purely fictitious, we find that he has failed to carry his burden of proving that valid loans were not made at the inception by General Credit to real debtors. There are a number of external materials supporting the existence of those loans— contracts, confirmations received, ledger cards, record entries, etc. Plaintiff points to the absence of affirmative confirmation from the individual customer-debtors (rather than the company selling the product) and to gaps in the corporation's incomplete records for the taxable years; but in our view these factors are inadequate to vitiate what otherwise ap-

---

1. The defendant now admits that the company did overstate its income in one particular. See paragraph 7, infra.

2. In April 1950 taxpayer obtained authority to issue an additional 100,000 shares of Class A.

pear to be valid loans which were unexceptionable at their outset.[3] The alternative claim of invalidity-through-worthlessness (in 1949 and 1950) must also be rejected because it largely rests on a misconception of the principles of accrual accounting for tax purposes. Under the accrual system a taxpayer should accrue interest on a debt (admittedly owed to him) which he has a right to receive, even though no interest payments were actually received; such interest can be accrued until the debt is declared worthless and deducted as a bad debt. See Spring City Foundry Co. v. Commissioner, supra, 292 U.S. at 185–186, 54 S.Ct. at 645–646, 78 L.Ed. 1200. This taxpayer did not declare the challenged debts to be worthless in 1949 or 1950, nor did it deduct them as bad debts or charge them off. Under the law it had a certain discretion in the treatment of these items. See Reed v. Commissioner, 129 F.2d 908, 912–913 (C.A. 4, 1942); Moock Electric Supply Co. v. Commissioner, 41 B.T.A. 1209, 1211–1212 (1940); 5 Mertens, Law of Federal Income Taxation, Secs. 30.30, 30.65, ch. 30, pp. 57, 95. Although the judgment exercised by the then management may not have been the preferable course, it cannot be attacked by a subsequent management unless the prior choice was so erroneous that it could not in fairness be made. That cannot be said here. There is an insufficient showing by plaintiff (who has the burden) that the debts were definitively worthless in the taxable years. There is evidence, on the other hand, of bona fide attempts to collect in later years from two of the important debtors whose

accounts are now said to have been completely worthless in 1949 and 1950.[4] Hindsight may suggest that the Andersons were too optimistic in deeming the debts alive enough in 1949 and 1950 to warrant the accrual of interest, but hindsight does not show the prior management to have been arbitrary or unreasonable in taking this action. New management, be it a receiver or a new board of directors, cannot obtain a refund of income taxes simply by showing that the treatment of bad debts adopted by the earlier management, although lawful and reasonable, did not lead to as great a tax saving as some other plan. See In the Matter of Florida Rock Products Co., S. D.Fla., decided April 28, 1933, 15 A.F. T.R. 887.

■ 2. In 1949 the taxpayer made a bookkeeping entry transferring $5,000 from the capital surplus account to the earned surplus account, thereby reflecting or creating an income item of $5,000 which was incorporated in its return. The books give no clue to the nature of this item, but the accountant for the former management, who testified for the Government, did give an explanation. He said that originally this part of capital surplus arose from the reevaluation of assets purchased in 1944 from the American Security Company; by 1949 these particular assets had been liquidated and the gain or loss absorbed in current operations; therefore, according to this accountant, the balance in the capital surplus account should be transferred to earned surplus. One conclusive difficulty with this explanation is that the witness admitted, on cross-ex-

---

3. The "pyramiding" or "rolling over" of these loans (as described in paragraph 5, infra), so as to substitute new liabilities for the old, would not render the obligations fictitious for income tax purposes, though it might well be misleading for the purpose of borrowing money or showing the true financial condition of the company. See Spring City Foundry Co. v. Commissioner, supra, 292 U.S. at 189–190, 54 S.Ct. at 647, 78 L.Ed. 1200. If, however, Indiana law made it illegal to accrue interest on interest,

then the interest accrued on portions of "pyramided" accounts which represented previously accrued but uncollected interest was nonexistent income to the taxpayer and should not have been reported. See paragraph 5, infra, fn. 6.

4. The taxpayer maintained a reserve for bad debts instead of deducting bad debts directly; in 1949 and 1950, deductions for additions to this reserve were properly taken on the tax returns.

amination, that the assets in question were not liquidated in or before 1949, but instead in 1950. The item, if it existed at all, could not have represented income to the corporation in 1949. Plaintiff is therefore correct that in that year this amount of $5,000 represented non-existent income.

■ 3. The corporation made bookkeeping entries on June 30, 1950, debiting an asset account designated "Discounts" and crediting an income account called "Discounts Collected," thus showing an income item of $17,000. The Government says that this income reflected discounts earned and accrued in that year on customer's obligations, such as instalment sales financed by the taxpayer for various retail establishments. For support, the defendant relies on the accountant who contemporaneously went over the company's books for that year; he testified that he did not go behind these summary items as shown on the books but assumed them to be correct since they were consistent with what might be expected in a loan and discount business like General Credit Corporation's. Plaintiff presented the accountant chiefly responsible for the review made under the auspices of the new management in 1952; he testified that these entries were not backed by any other data in the corporation's files, of the kind usually demanded by accountants, and that in his opinion the company had simply attempted to create a wholly fictitious item of income. In this instance we are constrained to agree with the plaintiff that the entire absence of normal supporting data (or indication that any existed) means that this income item was created by the former management out of whole cloth—that it was truly fictitious in the elemental sense. The fact that the company's records are now incomplete in some respects is not enough to sustain an item so wholly lacking in foundation.

■ 4. The same holding must be made with respect to entries on June 30, 1950, debiting the asset account "Dis-counts" and crediting an income account called "Miscellaneous Income" so as to show income in the amount of $5,600. Like the $17,000 item discussed in paragraph 3, supra, this $5,600 item appears to have been a fictitious increment to earnings in 1950, wholly unsustained by any detailed records or data in which credence can be placed.

■ 5. At the close of its fiscal year on October 31, 1950, the taxpayer made entries debiting Floor Plan Renewals with offsetting credits to Floor Plan Interest Collected, reflecting an income item of $3,360.10. Floor plan financing is the lending of money to an automobile dealer (or other supplier of goods) so that he may purchase cars (or other articles) to include in his inventory; the loan is secured by the automobile while in the dealer's possession, and is gradually reduced as the cars are sold. With respect to this item, the plaintiff alleges that (a) many or all of these floor plan loans, purporting to have been made to dealers, were improperly secured or wholly fictitious; (b) that many accounts were "pyramided" or "rolled over" (at the end of a period in which no interest had been paid) by the creation of new debts (wiping out the old ones) for the amount of the original principal plus accrued but uncollected interest; and (c) floor plan loans were made to two entities ("Motor Sales Company" and "General Sales Company") which were nothing but names used for the taxpayer's own divisions or operations handling repossessed cars and trailers.[5] The latter loans were obviously fictitious and interest accrued thereon must be eliminated; a business cannot earn or accrue income on monies it "lends" or diverts to itself. We are not persuaded, however, by the plaintiff's other contentions on this item. The sole question we are to decide is whether the corporation could properly accrue interest (for income tax purposes) on these floor plan loans in 1950; we are not concerned whether the taxpayer's treatment of

5. Motor Sales and General Sales were not separate corporations.

these loans was proper or misleading in other respects or for other ends. See Spring City Foundry Co. v. Commissioner, supra, 292 U.S. at 189–190, 54 S.Ct. at 647, 78 L.Ed. 1200. Confining our inquiry to the tax sphere, we find that the floor plan loans (other than those purportedly made to "Motor Sales Company" and "General Sales Company") have not been proved to be fictitious, i. e., sham or invalid from the beginning. From the testimony on both sides it seems fairly clear that such loans were actually made prior to 1950. It may perhaps be bad practice or misleading to stockholders or potential creditors to "pyramid" a valid loan, but the "pyramided" obligation is not fictitious or void. It follows that, as we have earlier said as to comparable items of accrued interest (see paragraph 1, supra), the former management could properly accrue interest in these floor plan loans until they were declared worthless (or were required to be so treated). Since the loans were not so declared in 1950 and have not been shown to have been worthless in that year, interest could be accrued.[6] In sum, part of this income item of $3,360.10 was validly reported, but there must be excluded the portions reflecting interest accrued on "loans" to "Motor Sales Company" and "General Sales Company".

6. On October 31, 1950, the last day of its fiscal period, the taxpayer entered an item of $40,000 to reflect a sale of 5,280 shares of stock of Travelmaster Coach Corporation to Mr. W. A. Anderson, taxpayer's officer and director. Plaintiff's claim is that the General Credit Corporation did not own or sell this Travelmaster stock in 1950 and that the bookkeeping entries created fictitious income for that year. Resolution of this issue turns on conflicting evidence. The defendant's position—supported by the specific testimony of the taxpayer's former accountant and by some vague refer-ences in the corporate minutes and other records—is that the company did own these Travelmaster shares (which are said to have had a zero basis) and did sell them on October 31, 1950, to Anderson and Company (the alter ego of W. A. Anderson, one of the senior officers in control) in return for a $40,000 note, which was later reduced by payments to $4,600. On the other hand, plaintiff's evidence is that two years later no data existed in the taxpayer's files which unequivocally reflected the ownership of this stock or the alleged sale; that the Travelmaster Company's own stock records (which are not wholly complete) do not show or indicate any such transaction; that the former accountant's notes on the transaction (in his audit for 1950) were proved to be false in referring to "Anderson and Company" as a registered securities dealer which could dispose of the shares; that this accountant admitted on cross-examination that the taxpayer's records showed that it held the same amount of Travelmaster shares at the end of 1950 as at the close of 1949; and that there were other, cumulative, reasons why the taxpayer could not have earned this sum of $40,000 on a sale of Travelmaster shares. On this record, there is no reason to disturb the Trial Commissioner's finding that this $40,000 item was fictitious and non-existent. The plaintiff's evidence is the more persuasive.

7. Defendant admits the final items—an overstatement of $11,566.06 in 1949 on discounts (i. e., retail instalment sales contracts purchased at a discount from the retailer) earned in that year on accounts sold in the next year to A.S.C. Corporation, but entered on taxpayer's records as sold in 1949; and an overstatement of $11,877.66 in 1950 due to the taxpayer's erroneous failure to record this sale to A.S.C. Corporation as a 1950 (rather than a 1949) transaction. See findings 11(a) and 13(e).

---

6. If state law forbade the "pyramiding" of interest, then there should be excluded from income that part of the new "rolled over" or "pyramided" principal representing interest accrued in prior years but not collected.

8. The total of the items, discussed in paragraphs 1–7, which we have allowed will reflect the taxpayer's overpayments for 1949 and 1950. The exact amount will have to be determined by the Trial Commissioner under Rule 38 (c). But since it is probable that from this computation there will emerge a net operating loss for 1950 (but only a reduced tax for 1949) we must decide whether plaintiff is also entitled to utilize this loss as a carryback to 1949 to increase its recovery for that year. The defendant denies this right because, it says, the plaintiff's claim for refund did not assert, as a ground of recovery, the taxpayer's entitlement to a carryback of a net operating loss for 1950.[7] Plaintiff counters that the refund claims for each year clearly asserted that there was a loss in that period, and that if the Internal Revenue Service had agreed with this contention as to 1950 it would necessarily have been led to consider a carryback to 1949. Plaintiff is right. In filing claims for both 1949 and 1950 and in asserting that there were losses for both years, the taxpayer adequately alerted the Commissioner of Internal Revenue to the potential existence of a carryback from the later to the earlier period. The Commissioner would not be required to search for any possible year to which a 1950 loss might be carried; but, his attention being riveted on 1949–1950, it is reasonable to assume that he would and should have considered whether a loss in one of those years would affect the tax for the other (which was itself claimed as a loss year). This would not be "forcing the inquiry into an unexplored territory, into strange and foreign paths"; the Commissioner is simply being asked "to take action upon discoveries already in the making or perhaps already made. * * * At that point discovery has gone on to such a stage that the Commissioner may not rid himself of

the duty of pressing forward to the end." Demis Brothers Bag Co. v. United States, 289 U.S. 28, 35, 53 S.Ct. 454, 457, 77 L.Ed. 1011 (1933); see also Pink v. United States, 105 F.2d 183, 186 (C.A. 2, 1939). The refund claims were adequate to permit plaintiff to take advantage of a carryback of a net operating loss from 1950 to 1949.

The plaintiff is entitled to recover on the items and to the extent we have indicated, with interest as provided by law. Judgment will be entered to that effect. The amount of recovery will be determined under Rule 38(c).

JONES, Chief Judge, and DURFEE, LARAMORE, and WHITAKER, Judges, concur.

---

7. A ground for refund not raised or fairly comprised within the application made to the Internal Revenue Service cannot ordinarily be considered by the court from which the refund is sought. Real Estate Land Title & Trust Co. v. United States, 309 U.S. 13, 17–18, 60 S.Ct. 371, 84 L.Ed. 542 (1940); International Curtis Marine Turbine Co. v. United States, 56 F.2d 708, 74 Ct.Cl. 132, 140 (1932).