J. M. TURNER AND COMPANY, Incorporated, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 7365.

United States Court of Appeals Fourth Circuit.

Argued May 27, 1957.

Decided July 17, 1957.

William N. Pierce and Fortescue W. Hopkins, Roanoke, Va. (Hopkins & Pierce, Roanoke, Va., on the brief), for petitioner.

David O. Walter, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack and Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

This case comes before us upon a petition to review a decision of the Tax Court (26 T.C. 795), in which the Tax Court held that certain deficiencies of excess profits tax were properly assessed. The Tax Court held that the taxpayer was neither an "acquiring corporation" within the meaning of § 461(a) nor a "purchasing corporation" within the meaning of § 474(a) of the Internal Revenue Code of 1939 (26 U.S.C.A. Excess Profits Taxes) and was, therefore, not entitled, in computing its excess profits tax credit, to use of the earnings experience in the base period years of a predecessor sole proprietorship. The principal basis of the conclusion of the Tax Court was that the taxpayer did not acquire "substantially all the properties," as required by § 461(a) (1) (D), nor "substantially all of the properties (other than cash)," as required by § 474(a) (1) (A), of the predecessor sole proprietorship.

The taxpayer, a corporation, was organized under the laws of Virginia for the purpose of engaging in a contracting business, which theretofore had been conducted by its president and principal stockholder as a sole proprietor.

Turner, operating as an individual, had developed a successful contracting business with substantial annual net profits. He had a staff of managerial and supervisory personnel, and in December 1949 was engaged in 14 construction projects. As of December 31, 1949, the book value of his mixed business and personal assets was over $300,000.00, of which the largest items were cash of $94,979.45, and contracts account receivables of $178,-631.56.

Turner's books were kept on an accrual basis, but, for purposes of income taxes, he reported income on a completed contracts basis.

Late in 1949 Turner decided to organize a corporation. He was motivated by a desire to segregate business assets from personal assets, to limit his personal liability and to provide means of giving two of his employees a proprietary interest in the business. Accordingly, the taxpayer was incorporated on December 27, 1949, and on January 3, 1950, Turner paid into the corporation $55,000.00, against which 500 shares of common stock, of $100.00 par value each, were issued to him and 50 shares to his wife. At the same time his brother, one of his employees, paid in $5,000.00, against which 50 shares of stock were issued to him. On the same day Turner transferred to the taxpayer all of his office equipment, specified items of construction equipment, a Chevrolet truck and two of the fourteen contracts in process of construction. The transferred assets had a book value on Turner's individual books of $27,386.86 and they were set up on the books of the corporation upon that basis.

Expendable and small tools and similar items of equipment having an aggregate value, according to Turner, of approximately $6,000.00 were also turned over to the corporation. Since they were not capitalized on the books of the proprietorship, however, no entries respecting them were made on the books of the corporation.

The only physical assets used in the business which were not transferred to the taxpayer were a Lorain shovel having a book value of $8,703.87 and an automobile having a book value of $319.65.

Turner testified that the Lorain shovel was not suitable to the needs of a building contracting business. It had been purchased by him when he was in urgent need of excavating equipment,[1] but it did not have a boom of the type which would permit its use in setting steel or pouring concrete. Turner planned to have the new corporation purchase a more appropriate piece of equipment, and in the fall of 1950 it did purchase a Lima crane.

The newly formed corporation, with the assets thus transferred, conducted a general contracting business with substantial profits in 1950 and 1951. The evidence does not disclose that the physical and liquid assets transferred to it were insufficient for its business needs, except that in 1951 its volume of business was such that it exceeded its bonding limits. In May, June and November of that year, Turner, individually, took contracts which the corporation could not perform, because of its bonding limits, which gave him a gross profit of approximately $41,000.00. But the corporation was operating successfully and profitably at the same time. Indeed, its operations were so profitable that this claim for a deficiency of excess profits tax arose with respect to its income in 1951.

In reaching its conclusion that the assets transferred by Turner to the corporation were not substantially all of the properties of the proprietorship, the Tax Court was principally concerned with the fact that he did not transfer twelve of the contracts then in process of completion, and that he retained the major portion of his cash in the bank. The contracts in process of completion were said to have been the most valuable asset of the proprietorship, representing very large potential profits, while the bank account, though admittedly representing personal as well as business cash, was treated as being an asset of the contracting business. At the same time the Tax Court refused to allocate any value to good will of the proprietorship, because it found no evidence that it had been transferred to the corporation.

1. Turner's practice had been to subcontract excavating work. He undertook it himself only when, in the post war period, equipment was scarce and it was difficult to procure others to do the work.

As to the twelve retained contracts, it is the apparent position of the Commissioner that they could, and should, have been transferred to the corporation, that the proprietorship, reporting on the completed contracts method, had derived no profit from them, that, transferred, the corporation would earn the profit and, presumptively, return it for taxation as its income. But these contracts were substantially completed at the time of the transfer. The last of them was completed in February of 1950 within two months following the transfer, except that Turner, upon the request of the owners and pursuant to his contracts, had to make minor adjustments, the last of which was accomplished in August 1950.

These contracts, being substantially completed at the time of the transfer, rather than representing large potential profits, represented profits actually accrued to Turner individually. The accrual was reflected in his balance sheet in the item of contracts accounts receivable and in his cash in bank. While the exact amount of that profit could not be finally ascertained with precision, because of unpredictable costs in winding up a construction project, it is clear that at the time of the transfer very substantial profits had already been earned and were accrued on those contracts.

The completed contracts method of reporting income for taxation is an equitable method of reporting widely used by contractors performing long term contracts or extensive construction work. Such work is subject to so many vicissitudes that it is difficult or impossible to reasonably determine what income has been earned when the end of the taxing period comes at a time when the work is not substantially completed. When reporting on a completed contracts basis, a contractor postpones reporting income until the completion of the contract, at which time his actual profit or loss can be determined accurately.

The completed contracts method of reporting, however, is not a device by which income can be transferred from one taxpayer to another. A change in the ownership of the contract during the course of construction would normally result in an accrual for tax purposes of income to the transferor, notwithstanding he had previously been reporting upon the completed contracts method. If Turner had transferred these twelve, substantially completed contracts to the corporation, particularly if the tax rate to the corporation was lower than the effective rate applicable to Turner's individual return, the Commissioner quite properly could have assessed tax on income, accrued to the date of the transfer, to Turner individually rather than to the corporation. Jud Plumbing & Heating Co. v. Commissioner, 5 Cir., 153 F.2d 681; Standard Paving Co. v. Commissioner, 10 Cir., 190 F.2d 330. It is quite apparent that any transfer of these contracts by Turner could have resulted in grave tax detriment to him and that the Commissioner, contrary to the theory of his position here, could have compelled him to treat the profit on such contracts, accrued to the date of transfer, as his individually even though he attempted to transfer it to the corporation. Under such circumstances it seems only reasonable to conclude, as Turner did, that the profits on these contracts, accrued to the date of the transfer, were his individual concern and not a part of the continuing contracting business to be conducted by the corporation. By retaining them and completing them himself, he avoided substantial tax questions and deprived the corporation of no substantial asset which was necessary or useful in its conduct of the general contracting business.

If it should be suggested that Turner could have transferred these contracts while retaining the obligation of paying income tax upon the profit accrued to the date of transfer, the result would have been to impose a substantial charge upon Turner's personal assets by putting into the corporation accrued profits, soon to be converted into cash, far in excess of the needs of the continuing business.

Turner on December 31, 1949, had cash in the bank of $94,979.45. While he went

through the form of transferring $55,-000.00 from this account in payment of his stock, he immediately transferred assets of the proprietorship, having a book value of $27,386.86, for which he received payment in that amount. In substance, he transferred at that time cash of only $27,613.14. Subsequently on July 8, 1950, Turner purchased from the corporation an additional 140 shares of stock at par, while his father purchased 10 of such shares. On October 13, 1950, his general superintendent purchased from the corporation another 200 shares at par, while Turner purchased an additional 50. These additional stock purchases, which provided the corporation with an aggregate of $40,000.00 in additional cash by October of 1950, do not mean, however, that the needs of the business at the level it was being conducted at the end of 1949 were in excess of $30,000.00 in cash, as Turner testified. The Korean War had intervened, and other considerations than the needs of the corporation for cash may well have played a part in the issue of the additional stock.

It is quite true that there was no analysis of Turner's individual bank account up to the end of 1949 which would aid in a finding as to what portion of that account was properly attributable to the contracting business and what portion attributable to his individual and other purposes. What was done, however, amounted to a segregation of that bank account, allocating as of the date of the transfer $27,613.14 to the contracting business and the remainder to Turner individually. In the light of Turner's testimony that $30,000.00 in cash was adequate for the volume of business then being conducted and the subsequent financial history of the corporation, we cannot say that this was unreasonable.

It is common practice for a sole proprietor to mingle his business and personal cash in a single account, and his conversion of portions of accumulated profit to his personal use is not attended with the formalities required of corporate or other organizations in making distributions of earnings to the stockholders or owners. If this had been a transfer from a corporation to a corporation, the Commissioner would not complain that the transferor, prior to the transfer, declared a dividend payable out of accumulated earnings, nor would it be supposed the fact of such a dividend declaration would present any question but that a transferee subsequently acquiring all of the remaining assets, acquired substantially all of the properties of the transferor within the meaning of § 461 (a) and § 474(a) of the Code. Commissioner of Internal Revenue v. First National Bank of Altoona, 3 Cir., 104 F.2d 865. Such an allocation or distribution was made, in effect, by Turner in this instance. Unless we can find his allocation unreasonable, the amount of his retained cash has no direct bearing upon our problem of determining whether or not the corporation acquired substantially all of Turner's assets used in the contracting business.

Turner testified that his good will as a contractor was transferred to the corporation and he estimated that the good will was worth $350,000.00. The Tax Court found, however, that no good will had been transferred notwithstanding the fact that Turner's name and organization were transferred to the corporation. It found that Turner had not capitalized good will upon the books of the proprietorship and no such capital item was entered upon the books of the corporation. But capitalization of good will in the absence of specific cost attributable to it, is very imprudent if not improper. Absence of capitalized good will on the books of an individual proprietor, or of a corporation, does not mean that there is none.

Turner, with his organization, had developed a reputation of doing good work and of financial responsibility. He testified regarding his established status as an acceptable bidder with business concerns and architects in Virginia. Substantial earnings in relation to net worth and the volume of business he was able

to command indicate that his good will had a substantial value.

Whatever the value of the good will, it certainly was transferred to the corporation. There was no formal instrument of transfer of good will nor was there one of the physical assets of the partnership. There was no formal agreement on Turner's part not to compete with the corporation, but he as a director, president and controlling stockholder of the corporation was under a fiduciary duty which required of him the highest degree of loyalty to the corporation itself. In 1951 when Turner did take several contracts individually, because the corporation could not take them, having reached its bonding limit, it is to be supposed he acted with the consent and approval of the minority stockholders. There is nothing in the record to indicate that they did not consent to and approve his handling of those contracts.[2]

If any reasonable value is allocated to the good will and added to the actual value of the physical assets and the cash transferred by Turner to the corporation, we can only conclude that substantially all of the properties of the sole proprietorship used in the general contracting business were in fact transferred to the corporation. The subsequent successful operation of the corporation coupled with the fact that Turner, until the special situation arose in 1951, no longer engaged individually in the contracting business, indicates the correctness of this conclusion. We have not overlooked the fact that very substantial liabilities (accounts payable and taxes on income accrued to the date of transfer) were retained by Turner and should be offset against retained cash and accounts receivable, but we are more impressed with the fact that the corporation received properties which enabled it to continue the same business theretofore conducted by Turner individually.

What was said in Gross v. Commissioner, 5 Cir., 88 F.2d 567, 569, is appropriate here:

"Note that the statutory expression is 'properties,' not assets. All the properties of Tampa Box Company useful in its business, including such cash as was needful for working capital, were transferred entire to the new corporation with intent that the business be continued. The surplus cash assets, though property in a broad sense, were such as might have been paid out as an ordinary cash dividend before the transfer, and were not a substantial part of the business 'properties' of the Tampa Box Company."

In Commissioner of Internal Revenue v. First National Bank of Altoona, 3 Cir., 104 F.2d 865, 870, the Court said:

"If the old company had distributed these 'other assets' to its stockholders prior to these transactions rather than afterward, it could not have been denied that the old company had transferred 'substantially all' of its property to the new company. Instead of doing this, it transferred its distributing business to the new company first and then distributed its 'other assets' to its stockholders as a liquidating dividend. As the 'other assets' were never used to continue the old company in business, and as its liquidation was merely carrying out a previous agreement, it does not seem that the date of the distribution of these 'other assets' should be considered as decisive of the issue. Under the peculiar circumstances of this case, it seems clear that 'substantially all the properties' of the

---

2. For the reasons suggested, the performance of these contracts by Turner in 1951 does not mean the individual proprietorship did not cease to exist within the requirement of § 474(c) (1) upon its complete liquidation when the retained contracts were completed in 1950. Turner was under an overriding duty not to continue the existence of his contracting business as a sole proprietor and we can only conclude that it was revived in 1951 because of the special circumstances which then confronted the parties.

old company were transferred to the new company in exchange for stock in the latter."

■ Viewed in its entirety we conclude that the properties transferred by Turner to the corporation were substantially all of the properties used in, and necessary for, the continuation of his contracting business. Retained assets were either inappropriate to the continuing business, were surplus liquid assets which the individual proprietor had a right to appropriate as his own, or assets, largely offset by retained obligations, the transfer of which would have presented embarrassing tax consequences and which the Commissioner could have compelled the individual to treat as his own. The business having been continued by the corporation, we conclude that it acquired substantially all of the properties of the predecessor sole proprietorship within the meaning of § 461(a) and § 474(a). See also Schuh Trading Co. v. Commissioner, 7 Cir., 95 F.2d 404; Faigle Tool & Die Corp., 7 T.C. 236; Milton Smith, 34 B.T.A. 702.

There remains the question of whether the corporation was an "acquiring corporation" within the meaning of § 461(a) or a "purchasing corporation" within the meaning of § 474(a) of the 1939 Code. Since the essential requirement of § 461(a) is that the exchange be one to which § 112(b) (5), or so much of § 112(c) or (e) as refers to § 112(b) (5), 26 U.S. C.A. §§ 112(b) (5), (c, e) is applicable, our attention must be directed to the nature of the transfer.

While there was no bill of sale or other instrument of transfer, the transaction was given the form of a sale. Turner paid $55,000.00 in cash into the corporation against which stock was issued. Substantially contemporaneously, entries were made on the books of the sole proprietorship and on the books of the corporation recording the transfer of those transferred assets which had a book value on the books of the proprietorship. The aggregate of that book value, $27,386.86, was recorded on the books of the proprietorship as a debit to notes and accounts receivable and on the books of the corporation as an account payable. Had Turner, in form, exchanged the transferred assets together with cash in the amount of $27,613.14 ($55,000.00 minus the book value of transferred assets) for 550 shares of the common stock of the corporation, he would have reached exactly the same result.

Apparently the transaction was deliberately cast in the form of a sale to avoid the requirement of § 13.1–16 of the Code of Virginia 1950 of supporting statements and resolutions as to actual value of property to be exchanged for stock. By going through the form of a stock subscription for cash and sale of the transferred assets, it was thought, whether or not correctly, that the requirement of the Virginia Code would be avoided and the formation of the corporation expedited.

At that time there was no reason to suppose that other considerations should influence the selection of the form of the transaction. The outbreak of the Korean War did not occur until six months later, and there then was no applicable tax on "excess profits." Whether the form employed was that of a tax-free exchange within the literal language of § 112(b) (5) or a sale at book value, no actual income tax liabilities would be imposed upon the transferor.

■ We are not to so center our attention upon the form of the transaction, however, as to permit its substance to escape us. Indeed, it is the substance, not the form, of the transaction, which must control our conclusion, and a transaction accomplished in two mutually dependent steps should be viewed as a whole. Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755; Minnesota Tea Co. v. Helvering, 302 U. S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Starr v. Commissioner, 4 Cir., 82 F.2d 964; Helvering v. Elkhorn Coal Co., 4 Cir., 95 F.2d 732; Morgan Mfg. Co. v. Commissioner. 4 Cir., 124

F.2d 602; Reed v. Commissioner, 4 Cir., 129 F.2d 908.

It is perfectly clear that Turner's intent was to incorporate the contracting business he had been conducting as an individual proprietor. That purpose is ordinarily and directly accomplished by transferring properties used in, and necessary for the conduct of, the business in exchange for securities of the new corporation, a transaction to which § 112(b) (5) is clearly applicable. In an effort to avoid compliance with a statute of Virginia, an indirect route was taken to reach the same result, but we should not permit the deviousness of the route to obscure the nature and character of the journey.

Aside from the bare form employed there is nothing here in the nature of a sale. There was no bargain, not even a suggestion of a consideration of actual values. A transfer of properties at book value, though some of them were not even capitalized to a corporation controlled by the transferor, when the transferor, in the end, owns securities in lieu of the properties he formerly owned, has all of the substantive aspects of an exchange for stock, none of the substantive aspects of a sale.

In A. C. Burton & Co. v. Commissioner, 5 Cir., 190 F.2d 115, the same question was presented to the Court of Appeals for the Fifth Circuit. The circuitous route taken there was for the purpose of avoiding the necessity of compliance with a Texas statute, similar to the Virginia statute Turner sought to avoid here. That court looked to the actualities of the situation and concluded that, substantively, the transaction was within the nonrecognition provisions of § 112(b) (5) and, hence, the transferee was an "acquiring corporation" within the meaning of § 461(a) and entitled to use the earnings record of its predecessor in computing its excess profits tax credit.

Upon the accomplishment of the transactions of January 3, 1950, Turner was clearly in control of the corporation within the meaning of the requirement of § 112(b) (5). Subsequently, in June and again in October 1950, additional stock was issued for cash. After the issue of stock in October, Turner's stockholdings were less than 80% of all of the stock outstanding, but there is nothing to indicate that the stock issued in June and October was sold pursuant to any pre-existing agreement. Turner testified there was no such agreement and that after January 3, 1950, the sale of stock to others was subject alone to his determination and discretion. The subsequent sales of stock cannot be viewed as integral steps in the performance of a general agreement, and § 112(b) (5) requires only that Turner have been in control of the corporation immediately after January 3, 1950.

We thus conclude that the taxpayer here did acquire substantially all of the assets of the predecessor proprietorship. It was done in a transaction within the meaning and requirements of § 112(b) (5). Accordingly it is an "acquiring corporation" within the meaning of § 461(a) and is entitled to use the earnings experience of the predecessor in computing its excess profits tax credit.

The taxpayer contends that no question had been raised as to the correctness of its computation of its excess profits tax credit under § 461(a) and that, in view of our holding, there should be no remand. Neither the Commissioner nor the Tax Court ever reached that question, but there was a stipulation in the Tax Court by which the parties agreed to sever the legal issue and to reserve the question of computation for subsequent agreement or proceedings. It is necessary that the case be remanded to the Tax Court to effectuate that stipulation.

Reversed and remanded.