[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 02-10716

———————————————

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 21, 2003
THOMAS K. KAHN
CLERK

Tax Court Docket Nos. 20220-98, 20221-98


ALAN G. BONE, KATHLEEN A. BONE,
JEFFREY M. GUERRERO, GENEDINE
R. GUERRERO,

                                    Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

                                    Respondent-Appellee.

———————————————

Appeal from a Decision of the
United States Tax Court

———————————————

**(March 21, 2003)**


Before ANDERSON and CARNES, Circuit Judges, and HAND[*], District Judge.

ANDERSON, Circuit Judge:

---

[*]Honorable William B. Hand, United States District Judge for the Southern District of Alabama, sitting by designation.

Petitioners, Alan & Kathleen Bone and Jeffrey & Genedine Guerrero (hereinafter "Taxpayers"), challenge the decision of the United States Tax Court disallowing over $2 million in deductions taken in 1993 by their business, A.J. Concrete Services, an S corporation ("AJCS").[1]  These deductions related to expenses attributable to various long-term construction contracts that AJCS transferred to four related C corporations in January 1993.  The Tax Court concluded that the deductions were impermissible because the expenses benefitted the C corporations, not AJCS, once the contracts were transferred.  Taxpayers appeal that decision.  We affirm.

## I.  BACKGROUND

AJCS is an S corporation that was incorporated in 1987.  Jeffrey Guerrero owns 51% of AJCS and Alan Bone owns the remaining 49%.  AJCS was originally in the construction business, with its principal focus on supplying construction

---

[1]In an earlier case, we discussed the difference between a traditional corporation (a C corporation) and an S corporation:

> Simply speaking, under Subchapter C of the Internal Revenue Code, the income of a C corporation is subject to corporate tax and any distributions it makes to its shareholders will be subject to a second, individual tax. Under Subchapter S, certain C corporations are permitted to elect to be S corporations. While the S corporation determines taxable income at the corporate level, this corporate income is passed through to the S shareholders and taxed to them at their individual rates.

Coggin Auto. Corp. v. Commissioner, 292 F.3d 1326, 1327 n.3 (11th Cir. 2002) (internal citations omitted).

forming services to contractors. AJCS was a calendar-year taxpayer (i.e., it calculated its income and resulting tax based on revenues and expenses received and paid during the calendar year), and it utilized the "completed contract method" of accounting for tax purposes.[2]  For financial accounting purposes, however, AJCS used the "percentage of completion" method, which reflects revenue and expenses already received from and dedicated to ongoing contracts.

As of December 31, 1992, AJCS had $2,680,500 of recognized gross profit related to 29 partially-completed construction contracts.[3]  On January 1, 1993, the company transferred all of these contracts to four C corporations:  A.J. Concrete Forming of Georgia ("Georgia"); A.J. Concrete Forming Central, Inc. ("Central"); A.J. Concrete Forming East, Inc. ("East"); and A.J. Concrete Forming West, Inc.

---

[2]"Under the completed contract method, the total income from a contract is recognized, and the total costs of performance are deducted, in the taxable year in which the contract is completed." Broadway v. Commissioner, 111 F.3d 593, 594 n.4 (8th Cir. 1997).

[3]As of December 31, 1992, AJCS estimated that the overall value of the ongoing contracts was $19,975,949, and that it would make an overall gross profit of $8,763,221. The recognized gross profit figure discussed supra ($2,680,500) represented the difference between contract revenues received ($6,733,848) and actual costs expended ($4,053,348) as of December 31, 1992.

("West") (hereinafter, collectively, the "C Corporations").[4]  There was a written assignment contract, though that contract was never signed or dated by any of the parties.  Among other things, the contract provided that:

- Any and all of AJCS's ownership rights in the partially completed contract would be transferred to the C Corporations as of January 1, 1993.

- The C Corporations would complete the work on the contracts and their compensation would be the unpaid balance on those contracts.

- The C Corporations acknowledged that their costs might exceed the revenues on the assigned contracts.

- AJCS was responsible for general and administrative costs as well as any indirect costs associated with the assigned contracts.

The ostensible purpose of assigning the contracts was to allow AJCS to get out of the construction forming business and into the business of providing management services to the C Corporations in exchange for fees equal to approximately three percent.

Because AJCS used the completed contract method for tax purposes, it was

---

[4]The stock ownership in the four C Corporations was as follows: (1) Georgia was owned 47.5% by Guerrero, 47.5% by Jeff Klewein, and 5% by Jeff Hoylman; (2) Central was owned 47.5% by Jeff Klewein, 47.5% by Rick Klewein, and 5% by Dave Entinghe; (3) East was owned 47.5% by Bone, 47.5% by Rick Klewein, and 5% by Robb Webb; and (4) West was owned 47.5% by Bone, 47.5% by Jeff Klewein, and 5% by Ken Ritter.  While Taxpayers owned large shares in 3 of the 4 C Corporations, they did not own a majority interest in any of them.

4

not required to report the $2,680,500 in recognized gross profits until the period in which the contracts were completed, or, as in this case, until the contracts were transferred. Thus, on its return for the 1993 tax year, AJCS reported as gross income the $2,680,500 in recognized gross profits from the transferred contracts. AJCS also claimed deductions totaling $2,808,034 relating to the transferred contracts, including $546,479 attributable to overhead allocated to 1992. The result was that AJCS reported a net loss for the 1993 tax year of $236,300.

After conducting an audit of AJCS's 1993 return, the IRS determined that all of the deductions, save for the overhead expenses allocated to 1992, should be disallowed because the expenses were incurred in 1993, after the contracts were transferred. Primarily because of the disallowance of those deductions, which totaled $2,261,555, the IRS determined that AJCS had a taxable income of $2,470,021 rather than a loss of $236,300. Because the tax liability of an S corporation flows through to the individual taxpayers, the IRS issued a notice of deficiency for the adjustments to the Taxpayers. The notices showed a tax deficiency of $524,103 for the Bones and $545,324 for the Guerreros.

Taxpayers filed a petition in the United States Tax Court seeking a redetermination of the alleged deficiencies. Prior to trial, the parties stipulated that the partially-completed contracts were transferred to the C Corporations on January

5

1, 1993. At trial, AJCS's chief financial officer testified that the contracts were in fact transferred to the C Corporations on that date, and that the C Corporations had worked on and completed a number of the contracts in 1993, claiming income and expenses associated with those projects. He also testified that $2,625,666 of the $2,808,034 in reported expenses were associated with the transferred contracts.

After the conclusion of the trial, the Tax Court ruled in favor of the Commissioner, holding that $2,261,555 of the expenses deducted by AJCS were really expenses of the C Corporations because they were incurred after the contracts were transferred. The court rejected the notion that AJCS was required by the assignment contract to pay those expenses because that agreement was neither signed nor dated. The court also noted that a company cannot, as a general rule, deduct expenses incurred on behalf of another taxpayer, and that an exception to that rule did not apply in this case. The court also found that the Taxpayers had not adequately preserved the issue of whether their income was overstated and had failed to present sufficient evidence to support their deduction for workers' compensation insurance, a deduction the court indicated likely belonged to the C Corporations. After the Tax Court denied Taxpayers' motion to reconsider its decision, Taxpayers filed this appeal.

## II. STANDARD OF REVIEW

We review the Tax Court's findings of fact for clear error, even where those facts are based on stipulations entered into by the parties. See Florida Hosp. Trust Fund v. Commissioner, 71 F.3d 808, 810 (11th Cir. 1996). We review the Tax Court's legal conclusions de novo. Id. Whether a party earns income under I.R.C. § 61 is a question of fact reviewed under the clearly erroneous standard. See Commissioner v. Duberstein, 363 U.S. 278, 291-92, 89 S.Ct. 1190, 1200 (1960) (reviewing for clear error the determination of whether a transfer was a gift). Likewise, whether an amount paid by a corporation is deductible as an "ordinary and necessary business expense" of the corporation under I.R.C. § 162(a) is a question of fact, see Commissioner v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 254 (1943), and we thus review such a finding for clear error. At the time the case was tried, the Commissioner's determinations in his notices of deficiency were entitled to a presumption of correctness, and Taxpayers bore the burden of proving, by a preponderance of the evidence, that the Commissioner's determinations were incorrect. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9 (1993).[5]

---

[5]For audits beginning after July 2, 1998, the burden of proof was shifted to the Commissioner under certain circumstances. See I.R.C. § 7491.

## III. ANALYSIS

Our analysis here begins with the well-settled proposition that when a taxpayer who is using the completed contract method for tax purposes disposes of a contract prior to its completion, the taxpayer must recognize its allocated portion of the contract revenue, and may deduct any corresponding portion of its expenses, as of the time the contract was transferred. See Jud Plumbing & Heating, Inc. v. Commissioner, 153 F.2d 681, 685 (5th Cir. 1946) (requiring dissolved corporation to include as income progress payments on partially-completed contracts where contracts were transferred to corporation's principal shareholder upon dissolution)[6]; Dillard-Waltermire v. Campbell, 255 F.2d 433, 436 (5th Cir. 1958) (affirming Commissioner's reallocation of income earned prior to the transfer of partially-completed contract).[7] The Tax Court found that AJCS transferred its interest in the partially-completed contracts as of January 1, 1993. The company thus properly

---

[6]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[7]See also J.M. Turner & Co. v. Commissioner, 247 F.2d 370, 373 (4th Cir. 1957) ("The completed contracts method of reporting . . . is not a device by which income can be transferred from one taxpayer to another. A change in the ownership of the contract during the course of construction would normally result in an accrual for tax purposes of income to the transferor, notwithstanding he had previously been reporting upon the completed contracts method."); Standard Paving Co. v. Commissioner, 190 F.2d 330, 332-33 (9th Cir. 1951) (same).

declared as income AJCS's gross profits on the contracts prior to the date of transfer, $2,680,500. As a general matter, though, Taxpayers would not have been entitled to deduct expenses related to those contracts that were incurred after the date on which the contracts were transferred to the C Corporations.

Notwithstanding these well-settled principles, Taxpayers argue that they are entitled to relief. They first claim that the Tax Court erred when it determined that the contracts were in fact transferred from AJCS to the C Corporations. The parties stipulated prior to trial that "[o]n January 1, 1993, [AJCS] transferred its incomplete contracts to [the] four "C" Corporations . . . ." At trial, Taxpayers argued, among other things, that the expenses AJCS incurred in 1993 were expenses that it was contractually required to undertake pursuant to the written agreement assigning the partially-completed contracts to the C Corporations.[8] The Tax Court concluded that the agreement was invalid, citing the fact that it was unsigned, undated, and "lacking in the usual earmarks of a contract that has been negotiated at arm's length." Taxpayers insist that the stipulation was predicated on the assignment's validity, and that if the assignment is said to be invalid, the

_____

[8]Even if the Tax Court had found the written agreement was valid, it would not have helped Taxpayers. Under that agreement, Taxpayers were responsible only for "general and administrative" and "indirect" costs associated with the assigned contracts. Taxpayers' problem is that they failed to prove that the $2,261,555 they seek to deduct were general, administrative, or indirect expenses.

9

stipulation should be deemed invalid as well. Without the stipulation, Taxpayers argue that there is no evidence to support a finding that the contracts were in fact transferred. And, if the contracts were not transferred, they argue that any expenses incurred in relation to those contracts were properly claimed by AJCS.

We do not agree. The stipulation speaks for itself and makes no reference to any assignment contract. Moreover, the fact that the particular assignment contract was deemed invalid does not exclude the possibility that a transfer nonetheless occurred. At oral argument, we specifically asked Taxpayers' counsel whether AJCS received the remaining balance of the $19 million due on the contracts. She conceded that the money due under the contracts was paid to the C Corporations, not AJCS. The fact that the balance due on the contracts was paid to those corporations indicates that a transfer indeed occurred, regardless of the validity of the written, but unsigned, contract examined by the Tax Court. In light of that fact, the stipulation between the parties, the testimony at trial, and the other conduct of the parties, we agree with the Tax Court that AJCS transferred the partially-completed contracts to the C Corporations on January 1, 1993. The Tax Court is certainly not clearly erroneous in that regard.

Though Taxpayers recognize the general rule that a taxpayer can only deduct expenses incurred prior to the date on which a partially-completed contract is

transferred, they insist an exception exists where a deduction is necessary to "match" expenses with revenue. In other words, if the revenue received represents a "prepayment" on work to be performed, Taxpayers insist that the costs associated with performing that work, even if they are incurred after the date of transfer, are allowable deductions.

Although we acknowledge that there is some authority for the proposition asserted by the Taxpayers, we need not resolve that legal issue. We reject that argument on the facts. First, it is not at all clear that this matching argument was raised in the court below when Taxpayers were represented by different counsel. Arguments not raised in the court below are usually not considered by this Court. Depree v. Thomas, 946 F.2d 784, 793 (11th Cir. 1991). More important, Taxpayers' counsel was unable to point to any evidence at oral argument specifically linking the expenses incurred in 1993 to the revenue received in 1992. Given the fact that only $6.7 million of the estimated $19.9 million in revenue on the project had been received by AJCS as of December 31, 1992, it is not self-evident that the expenses incurred in 1993 related to the $6.7 million already received rather than the $13.2 million remaining due on the project. After a careful review of the record, we are unaware of any evidence specifically linking the 1993 expenses to the $6.7 million received by AJCS prior to the transfer of the contracts.

11

Given the fact that Taxpayers bear the burden of proving their entitlement to the deduction at issue, this evidentiary gap is fatal to their claim.[9]

Taxpayers also argue that there is another exception permitting them to deduct

expenses related to a partially-completed contract after the transfer date. In order for a business expense to be deductible under I.R.C. § 162, the expense must be "ordinary" and "necessary." Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1378 (11th Cir. 1982). As a general rule, a payment by one taxpayer on behalf of another is not an ordinary and necessary business expense. See Welch, 290 U.S. at 114-15, 54 S.Ct. at 9-10. See also Dietrick v. Commissioner, 881 F.2d 336, 338 (6th Cir. 1989) ("It has long been the general rule that a taxpayer may not deduct expenses incurred on behalf of another taxpayer's business."). An exception applies, though, where the expenses are incurred to "protect or promote" the taxpayer's business. See Lohrke v. Commissioner, 48 T.C. 679, 684-85 (1967).

---

[9]For similar reasons, we also reject Taxpayers' argument that the court below erred by not finding that AJCS had overstated its income. This argument is merely the converse of the matching argument, in that Taxpayers argue that if the contracts (and their related expenses) belonged to the C Corporations, the $2,680,500 in gross income would rightfully belong to those corporations, not AJCS, because that money represented a payment for services to be performed at a later date. Like the matching argument, we cannot assume that the money received by AJCS prior to the date of transfer represented a prepayment for services to be rendered without evidence linking those specific monies to the expenses later incurred. Because Taxpayers have failed to point to any such evidence, we have no basis for granting their requested relief.

12

In Lohrke, the court noted that the first step in identifying whether this exception applies is to determine the taxpayer's motive for paying the obligations of another taxpayer. The court indicated that if the taxpayer's payment on behalf of another corporation is intended to serve as a capital investment of some kind, with the hope that the taxpayer might later realize a return on his investment in the way of increased profits in the other corporation, the exception does not apply. Id. at 688. On the other hand, the court recognized that if the payments are used to directly promote or protect the taxpayer's own business, the exception would apply. In reviewing the case before it, the court concluded that the taxpayer's payments were not intended as a capital investment in another corporation but were instead used to protect its own business. Consequently, the deductions were allowed. Id. This Court reached a similar result in Lutz v. Commissioner, 282 F.2d 614 (5th Cir. 1960). That case involved a situation where one corporation payed the debts of three corporations it controlled and attempted to claim those payments as deductible business expenses. We concluded that the payments were necessary to "protect and preserve" the controlling corporation's business. Specifically, we noted that the payments were needed to protect the goodwill value of the corporation's trademark and to ensure that it maintained its license with the Department of Agriculture. Id. at 620-21. We thus held that the deduction should

13

have been allowed.  Id. at 621.

As other courts have recognized, however, the "protect and promote" exception is limited to those situations where "there [is] 'a clear proximate danger to the taxpayer and . . . a payment made to protect an existing business from harm.'" Dietrick, 881 F.2d at 339 (ellipses in original) (quoting Young & Rubicam, Inc. v. United States, 187 Ct. Cl. 635, 410 F.2d 1233, 1243 (1969)).  The court in Dietrick emphasized that the burden is on the taxpayer to show "'a direct nexus between the purpose of the payment and the taxpayer's business or income producing activities . . . .'"  Id. (quoting Lettie Page Whitehead Foundation, Inc. v. United States, 606 F.2d 534, 538 (5th Cir. 1979)).  The court there affirmed the lower court's finding that the "protect and promote" exception did not apply because the taxpayer was attempting to establish a new business with his payments rather than furthering the interest of his existing business.   Id. at 640.

Taxpayers here argue that the "protect and promote" exception applies and that the Tax Court clearly erred in its finding to the contrary.  There are two parts to their argument.  First, they claim that the Tax Court erred by finding that AJCS had no valid reason for agreeing to pay the costs of completing the contracts in light of the fact that it was not to receive any of the proceeds from those contracts. Taxpayers insist that the court's finding is inconsistent with its earlier finding that

14

AJCS had received $2,680,500 of recognized gross profits related to the contracts. That profit, Taxpayers contend, was a prepayment on work to be performed, such that it was necessary for the company to complete the work in order to justify the income it received. Taxpayers appear to be rehashing their matching argument, and as with that argument, their claim fails because they have failed to substantiate their conclusory assertions with any evidence specifically linking the money received prior to the date the contracts were transferred with the expenses incurred in 1993.

Taxpayers also argue that the "protect and promote" exception applies in light of the obligations they undertook to various builders in the transferred contracts. Taxpayers insist that if those contracts were breached on account of the C Corporations' failure to complete them, they would have been liable for damages, and that as a result, their expenses in completing the contract were necessary to protect their own business. The Tax Court rejected this argument, though, because Taxpayers were unable to prove, to the court's satisfaction, that the C Corporations lacked the financial ability to complete the contracts. Its finding was based in part on the fact that the C Corporations actually loaned money to AJCS during the tax year in question. In addition, the fact that the C Corporations stood to receive the remaining $13.2 million due on the contracts suggests that the C Corporations had

15

the ability to complete the contracts. At the very least, we cannot say that the Tax Court clearly erred when it found that these expenses were used to benefit the C Corporations rather than AJCS.[10]

## IV.  CONCLUSION

Because we affirm the Tax Court's finding that the partially-completed contracts were transferred to the C Corporations on January 1, 1993, AJCS was not, under the applicable rules, entitled to claim as a deduction any expenses related to those contracts incurred after the transfer date. Taxpayers have failed to show that any exception to those rules applies here. Accordingly, the decision of the United States Tax Court is hereby **AFFIRMED**.

---

[10]For the same reason, we also reject Taxpayers' claim that they are entitled to a deduction for workers' compensation insurance premiums. The question is not whether those expenses were incurred; rather, the question is whether those expenses were incurred on behalf of AJCS, or at the very least to "protect or promote" its business. Because Taxpayers failed to show that the premiums were a necessary expenditure for AJCS's business, we cannot say that the Tax Court clearly erred when it denied Taxpayers the benefit of a deduction.

16