A08A2323. GEORGIA DEPARTMENT OF REVENUE
v. TRAWICK CONSTRUCTION COMPANY, INC.
(674 SE2d 350)

MILLER, Chief Judge.

In this tax case of first impression, the Commissioner of the Georgia Department of Revenue (the "Commissioner") issued a $224,800 additional tax assessment against Trawick Construction Company, Inc. ("Trawick") on January 13, 2004, as to the short-tax-year January 1, 1999 to October 1, 1999. On August 16, 2004, following Trawick's appeal to the Office of State Administrative Hearings, an administrative law judge ("ALJ") issued his Initial Decision finding that Trawick "demonstrated beyond a preponder-

ance of the evidence that the [Commissioner's] assessment of additional corporate Georgia income taxes on the proceeds of the Trawick stock transfer [at issue] was erroneous." The Commissioner thereafter reversed the Initial Decision of the ALJ. Trawick petitioned for judicial review, and the superior court reversed, returning the case to the status quo ante, reinstating the ALJ's decision. After we granted its application for discretionary review, the Department of Revenue (the "Department") filed its appeal, contending that the superior court erred (i) in rejecting the Commissioner's finding of fact that Trawick had elected tax treatment under 26 USC § 338 (h) (10) ("Section 338 election"), such treatment relieving Trawick of federal tax liability as to the gain it realized upon the sale of its stock and characterizing the sale of its stock as a "deemed sale"[1] of all its assets, (ii) in finding that Georgia's statutes do not tax such gain because Trawick's stock was sold pursuant to a Section 338 election made by Trawick's shareholders, and (iii) in finding that the additional tax assessment was constitutionally barred. Finding that the gain realized by Trawick as a result of the deemed sale of its assets is taxable under Georgia law, we reverse.

In broad terms, this case raises a question of law as to whether the Section 338 election at issue relieves Trawick of corporate tax liability under Georgia law as to the gain realized upon the proceeds from the deemed sale of its assets. "[E]rroneous applications of law to undisputed facts, as well as decisions based on erroneous theories of law, are subject to the de novo standard of review. [Cit.]" *Trent Tube v. Hurston*, 261 Ga. App. 525 (583 SE2d 198) (2003).

From its formation in 1960 through October 1, 1999, Trawick was a closely-held Florida corporation, and Trawick's shareholders, directors, and officers were all members of the Trawick family. Trawick was in the telecommunications business and did business in Florida, Alabama, Arkansas, Louisiana, Mississippi, North Carolina, South Carolina, and Georgia.

On October 1, 1999, Trawick's shareholders sold their shares in Trawick and a related company, CMI (collectively "Trawick"),[2] to Quanta Services, Inc. ("Quanta") for $36,500,000 under a stock

---

[1] The effect of a Section 338 election is to create a fiction whereby the amount paid for the stock of a corporation is treated as a sale of the corporation's assets which is tax free for federal tax purposes. See *Canteen Corp. v. Commonwealth of Pennsylvania*, 818 A2d 594, 597 (Pa. Comm. Ct. 2003).

[2] The parties stipulated that Trawick and CMI were under common control and ownership, but were neither a consolidated group nor an affiliated service group.

purchase agreement. The agreement provided that

> [a]t Quanta's option, each of the Companies [(Trawick and CMI)] and the Stockholders will join with Quanta in making an election under Section 338 (h) (10) of the Internal Revenue Code (and any corresponding election under state, local and foreign Tax law) with respect to the purchase and sale of the stock of the Companies. . . .

To consummate the sale, each of Trawick's shareholders, among them Jenee Floyd, signed a consent form stating, "I consent to the election between [Quanta] and [Trawick] to treat the acquisition of [Trawick], as an asset purchase and its resulting tax affects [sic] pursuant to [a Section 338 election]." Floyd made the election by signing a second document, Internal Revenue Code ("IRC") Form 8023, in her capacity as Trawick's "Vice President-Finance." Such form is for the use of entities termed a "common parent," a "selling affiliate," or, as here, an "S corporation shareholder[s]" in electing corporate tax treatment for federal purposes under a Section 338 election.

In exchange for their stock, the Trawick shareholders received $29,492,000 in cash and 273,921 shares of Quanta common stock having a fair market value of $7,008,000. After the sale, Trawick continued to conduct business in Georgia as a wholly-owned subsidiary of Quanta, a Delaware corporation, having its principal place of business in Texas. Trawick remains a Florida corporation and operates from its presale address in Chipley, Florida.

Because Trawick was being taxed as a Subchapter S corporation at the time of the acquisition, its shareholders, rather than the corporation, were required to report and pay, pro rata, the federal business income tax due on the transaction under 26 USC §§ 1366 (a) and 1377 (a) (1).[3] After the deemed sale of its assets, Trawick, having become a subsidiary of Quanta, filed its 1999 Georgia corporate tax return on the transaction as a Subchapter C corporation.[4] In doing

---

[3] A Subchapter S corporation is a "pass through entity" for income tax purposes. That is, the corporation generally does not pay income taxes on its business income. Instead, the shareholders are required to report, pro rata, the corporation's business income on their individual tax returns and pay the attributable taxes. See *Bone v. Commr. of Revenue*, 324 F3d 1289, 1291 (11th Cir. 2003) ("While the S corporation determines taxable income at the corporate level, this corporate income is passed through to the S shareholders and taxed to them at their individual rates.") (punctuation omitted); see also Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶ 6.06 (1) (6th ed.).

[4] "[U]nder Subchapter C of the [IRC], the income of a C corporation is subject to corporate tax [as a traditional corporation] and any distributions it makes to its shareholders will be subject to a second, individual tax." (Punctuation omitted.) *Bone*, supra, 324 F3d at 1291.

so, Trawick reported federal taxable income of $35,961,518, net Georgia business income of $35,961,518, allocated[5] $29,689,534 thereof entirely to Florida, and apportioned[6] the remainder $6,271,984 as attributable to its business in Georgia. Of the income subject to apportionment, Trawick reported taxable business income in Georgia of $799,659. Based on that amount, Trawick arrived at a reported tax due Georgia in 1999 of $47,980 (6% of $799,659).

Upon review, the Commissioner determined that Trawick's correct business income subject to apportionment was $35,661,031, rather than $6,271,984 as calculated by Trawick, applied the same apportionment ratio that Trawick had used (.127497), and determined $4,546,674, rather than $799,659, to be Trawick's taxable business income in Georgia. Based on this finding and after crediting Trawick for certain taxes previously paid, the Department assessed Trawick an additional $224,820 in income tax, plus interest.

1. The Department contends that the superior court erred in rejecting the Commissioner's factual determination that Trawick had joined with its shareholders and Quanta in making the Section 338 election. The Department argues that the Commissioner as the ultimate factfinder was not bound by the ALJ's finding of fact. We agree.

Citing *Atkinson v. Ledbetter*, 183 Ga. App. 739 (360 SE2d 66) (1987), the superior court found that, absent reopening the record and taking additional testimony, the Commissioner was bound by the ALJ's finding of fact that Floyd signed IRC Form 8023 in her individual capacity as a shareholder and not for Trawick as its Vice President-Finance. We reversed the final agency decision in *Ledbetter*, however, not because the agency substituted its judgment for that of the factfinder ALJ without taking additional evidence, but because the ALJ's initial decision was not supported by any evidence. Id. at 741.

Further, while the any evidence standard of judicial review is applicable to this Court and the superior courts in reviewing an agency's decision (*Greene v. Dept. of Community Health*, 293 Ga. App. 201, 204 (666 SE2d 590) (2008)), it does not apply "to an internal agency appeal." Id. at 201. The ALJ's role at an adminis-

---

[5] "Allocation is a process whereby certain types of [corporate] income, often called 'non-business' income . . . are assigned in their entirety to a particular jurisdiction for tax purposes." *Roger Dean Enterprises v. Dept. of Revenue*, 387 S2d 358, 361 (Fla. 1980).

[6] Apportionment is the process whereby all corporate income, apart from nonbusiness corporate income, is attributed proportionately to all the states in which a multi-state corporation does business. *Roger Dean*, supra, 387 S2d at 361; see, e.g., OCGA § 48-7-31 (d) (2) (setting forth three-factor procedure for determining apportionable income in Georgia).

trative hearing is to act as the representative of the Department and to make a recommendation. Id. at 203. "[I]t is then up to the Commissioner to either allow the recommendation to become the Department's final decision (by taking no action), or to affirm, modify, or reverse the decision appealed from." (Citation and punctuation omitted.) Id.; see OCGA § 50-13-17 (a) ("On review from the initial decision of [the ALJ], the agency shall have all the powers it would have [had] in making the initial decision and, *if deemed advisable, the agency may take additional testimony or remand the case to the [ALJ] for such [additional] purpose.*") (emphasis supplied); see also OCGA § 50-13-41 (d) ("In reviewing initial decisions by the Office of State Administrative Hearings, the reviewing agency shall give *due regard* to the [ALJ's] opportunity to observe witnesses. If the reviewing agency rejects or modifies a . . . proposed decision, it shall give reasons for doing so in writing in the form of findings of fact and conclusions of law.") (emphasis supplied).

The Commissioner's finding, as a matter of fact, that Trawick joined in making the Section 338 election by signing the Form 8023 as Trawick's Vice President-Finance is supported by some evidence. Consequently, the superior court erred in rejecting such finding and adopting the contrary finding of the ALJ.

2. Further, the Department claims that the superior court erred in holding that Georgia statutes do not tax any of the gain recognized by Trawick pursuant to the deemed sale of its assets because: (i) a corporation's Georgia taxable net income is derived directly from its federal taxable income pursuant to OCGA § 48-7-21 (a) and the portion thereof that is attributable to property owned or business done in Georgia as determined by application of the statutory rules of allocation and apportionment; (ii) a Section 338 election is not one involving a Subchapter S corporation within the meaning of OCGA § 48-7-21 (b) (7); (iii) Trawick's status as a Subchapter C corporation in Georgia did not foreclose Georgia tax liability because it was neither the parent of a selling consolidated group nor a selling affiliate of a corporation; and, in any event (iv) the deemed sale of Trawick's assets as to goodwill was apportionable to Georgia under OCGA § 48-7-31 (d) for such purposes. Again we agree.

(a) Trawick's argument to the contrary notwithstanding, the Department contends that the superior court erred when it held that Trawick had no Georgia taxable income from the deemed sale because Trawick received nothing of economic value as a result of the transaction. " '[T]he realization of gain[, however,] need not be in cash derived from the sale of an asset.' " *Diedrich v. Commr. of Internal Revenue*, 457 U. S. 191, 195 (II) (A) (102 SC 2414, 72 LE2d

777) (1982). "Gain may occur as a result of an exchange of property, payment of the taxpayer's indebtedness, relief from a liability, or other profit realized from the completion of a transaction." *Helvering v. Bruun*, 309 U. S. 461, 469 (60 SC 631, 84 LE 864) (1940). It is the receipt of a "tax benefit" — not an "economic benefit" that controls. *Commr. of Internal Revenue v. Tufts*, 461 U. S. 300, 310 (II) (B) (103 SC 1826, 75 LE2d 863) (1983).

It is undisputed that Trawick received the tax benefit of a stepped-up basis in its assets as a result of the instant deemed sale, allowing it to claim increased depreciation and amortization deductions, thereby reducing its Georgia tax liability for subsequent periods. OCGA § 48-7-21 (a) provides that Georgia corporate taxable income consists of the corporation's federal taxable income "with the adjustments provided for in subsection (b) of this Code section and allocated and apportioned as provided in Code Section 48-7-31." Trawick recognized its gain on the deemed sale of its assets on its 1999 federal tax return and on its Georgia return filed that year as required by OCGA § 48-7-21 (a). And there is no requirement in Georgia law that, in addition to reporting its gain upon the deemed asset sale as taxable federal income, Trawick must have incurred and paid the federal tax as a condition precedent to incurring Georgia corporate tax liability thereon. OCGA § 48-7-31. Accord *Newell Window Furnishing v. Commr. of Revenue*, 2008 Tenn. App. LEXIS 750 * 8 (2008).

Given the foregoing, the superior court erred in finding that Trawick had no corporate tax liability because the deemed sale of its assets had not benefitted it economically.

(b) The Department contends that the superior court erred by relying upon OCGA § 48-7-21 in holding that "Trawick's Georgia taxable net income . . . must be determined as if no Section 338 election exists" because such an election is made by the shareholders of an S corporation, not a corporate taxpayer. Trawick argues that OCGA § 48-7-21 (b) (7) excludes elections "involving" Subchapter S corporations from the federal elections recognized in Georgia law. We are not persuaded.

OCGA § 48-7-21 (b) (7) provides that "[a]ll elections made by corporate taxpayers under the Internal Revenue Code . . . of 1986 shall also apply under this article except elections involving consolidated corporate returns and Subchapter "S" elections. . . ." By the stock purchase agreement, Trawick affirmatively agreed that it would join with Quanta and the shareholders in making the instant Section 338 election. Trawick did so by Floyd's signature in her capacity as Trawick's Vice President-Finance. While only Trawick's shareholders and Quanta could make the election as a matter of law (Treas. Reg. § 1.338-1 (a)), it is undisputed Trawick joined in making

the election as a matter of fact and received beneficial treatment for federal tax purposes, as discussed above.

Further, we find that the instant Section 338 election is not excepted from the reach of OCGA § 48-7-21 (b) (7). It is undisputed that the Section 338 election at issue does not "involve" a consolidated corporate return. Neither do we find such election to be one "involving" a Subchapter S election. Rather than involving a Subchapter S election, a Section 338 election is conditioned upon the prior existence of a Subchapter S election. See *Gen. Bldg. Products Corp. v. New Jersey Div. of Taxation*, 14 N. J. Tax 232, 255 (VII) (iii) (1994) (identifying Georgia as automatically recognizing the Section 338 election under OCGA § 48-7-21 (b) (7) if made for federal purposes); see also *In re Paschen*, 296 F3d 1203, 1208-1209 (III) (11th Cir. 2002) (indicating that modifying words, here the word "involving," should be construed as applicable to the word or words immediately preceded, and not as extending to and including others more remote, here the words "Subchapter 'S' elections") (citation and punctuation omitted), cert. denied, 537 U. S. 1097 (123 SC 696, 154 LE2d 648) (2002).

(c) The Department also maintains that the superior court erred in finding that the Section 338 election would not apply for Georgia tax purposes because "[it] is only available to a C Corporation [for federal tax purposes] if the C Corporation is a parent of a selling consolidated group or a selling affiliate of a corporation . . . , [and] Trawick was neither." The superior court's observation is correct only to the extent that Trawick is neither the parent of a selling consolidated group or a selling affiliate of a corporation. It does not follow, however, that Trawick is without tax liability in Georgia for the gain it realized as a result of the deemed sale of its assets because it filed its 1999 Georgia corporate tax return as a Subchapter C corporation.

It is undisputed that Trawick filed its 1999 federal tax return as a Subchapter S corporation. We have held that the instant Section 338 election made by Trawick, its Subchapter S shareholders, and Quanta is an election by a traditional corporate taxpayer for purposes of OCGA § 48-7-21 (b) (7). See *Bone*, supra, 324 F3d at 1291. Rather than relieving it of tax liability in Georgia, Trawick's status as a Subchapter C corporation for Georgia tax purposes means only that the gain it realized on the deemed sale of its assets for federal tax purposes is taxed to Trawick rather than to its shareholders. See *Gen. Bldg. Products*, supra, 14 N. J. Tax at 248-250 (IV), (V) (requiring that the gain from a deemed sale of assets be reported to the state by the sold corporation where, as here, state law does not allow such gain to be reported as it is for federal tax purposes). Thus, contrary to the holding of the superior court, Trawick's status as a

Subchapter C corporate taxpayer in Georgia does not foreclose Georgia tax liability as to the deemed sale of Trawick's assets.

(d) The Department claims that the superior court's order was error insofar as it held that even if Trawick's gain on the deemed sale of its assets were deemed taxable to Trawick for Georgia tax purposes, it is not "unitary [business] income apportionable under [OCGA § 48-7-31 (d)]," requiring that such assets, primarily consisting of goodwill valued at approximately $31 million, be allocated in its entirety to Florida as intangible property held for investment. This claim is likewise without merit.

Unitary income normally includes all income from a multi-state corporation's in-state business activities, but excludes income that " 'derives from unrelated business activity which constitutes a discrete business enterprise.' " *Hunt-Wesson, Inc. v. Franchise Tax Bd. of California*, 528 U. S. 458, 461 (I) (120 SC 1022, 145 LE2d 974) (2000), citing *Allied-Signal, Inc. v. Director, Div. of Taxation*, 504 U. S. 768, 773 (112 SC 2251, 119 LE2d 533) (1992). For tax purposes, Georgia's statutes designate certain categories of income or gain that must be allocated and provide that all remaining income must be apportioned. OCGA § 48-7-31 (c) and (d), respectively. The following types of income are allocable: income received from intangible property held for investment; rentals from real estate held for investment; and gains from the sale of property neither held, owned, or used in connection with a trade or business nor held for sale in the regular course of business. OCGA § 48-7-31 (c) (1)-(3). Whether business income is apportionable is subject to the functional test. "[I]ncome is [apportionable] under the functional test if the taxpayer's acquisition, control and use of the property contribute materially to the taxpayer's production of business income." *Hoechst Celanese Corp. v. Franchise Tax Bd.*, 106 Cal.Rptr.2d 548, 568 (22 P3d 324) (2001), cert. denied, 534 U. S. 1040 (122 SC 614, 151 LE2d 537) (2001).

Here, the parties stipulated that the value of Trawick's goodwill was $30,892,236.16. There is no indication in the record that Trawick's "goodwill" was not integral to the company's successful 15-year business history in Georgia or that it was merely an intangible held for investment in Florida as the superior court held. Pertinently, the record shows that Trawick brought its equipment into Georgia, rented Georgia properties to store the same, hired local employees, as necessary, in performing its contracts, did substantial work for Alltel Georgia, and, in 1999, reported having gross receipts in Georgia of $2,042,217 and paying salaries, wages, commissions and compensation attributable to business in Georgia of $49,882.

Goodwill, therefore, was "key" to Trawick's longtime operational business success in Georgia. See *Metropolitan Bank v. St.*

*Louis Dispatch Co.*, 149 U. S. 436, 446 (13 SC 944, 37 LE 799) (1893) (describing "goodwill" as "the advantage or benefit, which is acquired by an establishment . . . in consequence of the general public patronage and encouragement which it receives from constant or habitual customers"); see also *Pine Point Housing v. Lowndes County Bd. of Tax Assessors*, 254 Ga. App. 197, 200 (561 SE2d 860) (2002) (describing "[g]oodwill [as] a 'favor which the management of a business wins from the public,' and as such is . . . associated with a business operation . . .") (punctuation omitted).

Consequently, the superior court erred in holding that Trawick had no business income apportionable to Georgia under OCGA § 48-7-31 (d) and finding that Trawick's goodwill must be allocated in toto to Florida as intangible property.

3. By its final claim of error and related to our disposition of Division 2 (d) above, the Department contends that the superior court erred in holding that Georgia was constitutionally barred from taxing any portion of the gain which Trawick realized out of the deemed asset sale because doing so would violate the nexus requirements of the Due Process and Commerce Clauses of the U. S. Constitution. See *Container Corp. of America v. Franchise Tax Bd.*, 463 U. S. 159, 165-166 (I) (B) (1) (103 SC 2933, 77 LE2d 545) (1983) ("The Due Process and Commerce Clauses of the Constitution do not allow a State to tax income arising out of interstate activities — even on a proportional basis — unless there is a minimal connection or nexus between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise.") (citations and punctuation omitted). Inasmuch as it is undisputed that Trawick took advantage of the privilege of doing business in Georgia in a manner which added value to the company's assets and the value of its shareholders' stock, this claim also lacks merit. See *Mobil Oil Corp. v. Vermont*, 445 U. S. 425, 436-437 (II) (100 SC 1223, 63 LE2d 510) (1980) (finding sufficient nexus for state tax purposes if corporation avails itself of privilege of doing business in state benefitting corporation and corporation's shareholders). Even were it otherwise, Trawick joined with its shareholders and Quanta in making the instant Section 338 election and in structuring the transaction in such manner. See Division 2 (b), supra. Consequently, it cannot now complain that Georgia's tax laws treat the sale of the company's stock as a sale of its assets upon the Section 338 election. It is axiomatic that a taxpayer is free to organize his taxes as he chooses, but "having done so, he must accept the tax consequences of his choice, whether contemplated or not [cits.]. . . ." *Commr. of*

*Internal Revenue v. Nat. Alfalfa &c. Co.*, 417 U. S. 134, 149 (III) (94 SC 2129, 40 LE2d 717) (1974).

*Judgment reversed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED FEBRUARY 23, 2009

*Thurbert E. Baker, Attorney General, Warren R. Calvert, Senior Assistant Attorney General, Lourdes Gonzalez, Assistant Attorney General*, for appellant.

*Baker, Donelson, Bearman, Caldwell & Berkowitz, Robert G. Brazier, Michael S. Evans*, for appellee.

*Alston & Bird, Timothy J. Peaden, John L. Coalson, Jr., Ethan D. Miller*, amici curiae.